857 A.2d 88

**Benjamin Adam SIFRIT**

v.

**STATE of Maryland.**

**No. 142, Sept. Term, 2003.**

Court of Appeals of Maryland.

Aug. 27, 2004.

118

120

Stacy W. McCormack, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), for appellant.

Diane E. Keller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

GREENE, J.

A jury in the Circuit Court for Montgomery County, on April 9, 2003, convicted Benjamin Sifrit ("Benjamin"), of three crimes in connection with the death of Martha Crutchley. The crimes are: Count One, murder in the second degree, Count Three, assault in the first degree, and Count Nine,[1] accessory after the fact.[2] Benjamin's convictions and this appeal arise out of events that occurred over the Memorial Day weekend 2002 in Ocean City, Maryland, resulting in the death of two people, Martha Crutchley and Joshua Ford.[3]

---

1. The indictment indicates that Count Nine is accessory after the fact. The verdict sheet, however, refers to accessory after the fact as Count Seven. The correct count number for the charge of accessory after the fact is Count Nine.

2. The same jury, acquitted Benjamin of the murder of Joshua Ford and related offenses.

3. Due to extensive pretrial publicity, Benjamin's case was removed from the Circuit Court for Worcester County and transferred to the Circuit Court for Montgomery County.

In a related case, a separate jury in the Circuit Court for Frederick County, on June 10, 2003, convicted Erika Sifrit ("Erika"), Benjamin's wife, for her complicity in the murders of Ms. Crutchley and Mr. Ford. We granted Erika's petition for writ of certiorari. *Sifrit v. State,* 380 Md. 232, 844 A.2d 428 (2004). Subsequently, while Benjamin's appeal was pending in the Court of Special Appeals, we granted his petition for writ of certiorari before consideration of his claims by the intermediate appellate court. *Adam v. State,* 381 Md. 324, 849 A.2d 473 (2004). Even though many of the facts, issues, and legal arguments in these two cases overlap we answer the issues and contentions of the parties in separate opinions of this Court.

Benjamin raises the following issues:

1. Whether the State violated [Benjamin's] fundamental right to due process by presenting factually inconsistent theories at [Benjamin's] trial and that of his wife, Erika, both of whom were charged with committing the same crimes.

2. Whether the trial court [erred] in admitting the testimony of Michael McInnis regarding a conversation that [Benjamin] had with McInnis three years before the murders as prior bad acts evidence.

3. Whether the trial court erred in refusing to allow the defense to present evidence regarding Erika's ability to commit the crimes alone.

4. Whether the trial court erred in imposing separate sentences for second degree murder and first degree assault.

We shall affirm Benjamin Sifrit's convictions. A due process violation does not exist in a situation involving multiple trials based upon a single criminal transaction, unless the prosecution presents inconsistent theories and the inconsistency exists at the core, not the margins, of the State's case. It is not enough for a due process violation that there are discrepancies because of rational inferences drawn from ambiguous evidence, provided that the multiple theories are

supported by consistent underlying facts. In the present case, the State's theory that Benjamin and Erika committed the criminal offenses together as a team remained consistent throughout both trials. Any inconsistency in inferences or emphasis placed on particular facts by the State were consistent with the State's underlying theory of the case and did not violate Benjamin's right to due process. In addition, we discern no reversible error in the trial court's rulings with regard to the admissibility of the testimony of Michael McInnis and the exclusion of the testimony of Elizabeth Sifrit. Finally, we shall vacate the sentence imposed for Count Three, first degree assault, treating it, for sentencing purposes, as merging with the conviction for second degree murder, Count One.

## I.

On Friday, May 24, 2002, Martha Crutchley and her boyfriend, Joshua Ford, drove from Virginia to Ocean City, Maryland, for the Memorial Day weekend. Erika and her husband Benjamin were also vacationing in Ocean City over the holiday weekend. On Saturday night, May 25, 2002, the Sifrits met Ms. Crutchley and Mr. Ford on a bus on their way to Seacrets, a popular Ocean City nightclub. The Sifrits did not have the exact change for the fare so Ms. Crutchley and Mr. Ford offered to pay the Sifrits' fare if they would buy them a drink when they arrived at Seacrets. The foursome and two other people from the bus, friends Anne Carlino and Jeff Hysee, spent the rest of the evening together at Seacrets.

What happened in the early morning hours following the night at Seacrets is unknown. We do know, however, that at 3:00 a.m. on Sunday, May 26, 2002, Erika called 911 claiming that people she did not know were in her condominium unit and she could not find her purse. She was "afraid I'm going to have a robbery here." The call abruptly ended and no one was dispatched to the condominium.

On Tuesday, May 28, 2002, one of Ms. Crutchley's coworkers notified the Fairfax City police that Martha Crutch-

ley failed to show up at work following the Memorial Day weekend. Fairfax City police contacted the Ocean City police who found Ms. Crutchley's car outside the condominium where she and Mr. Ford were staying for the weekend. The police found the couple's belongings left in their condominium as if they had just stepped out. Concerned about Ms. Crutchley and Mr. Ford, the police began to search actively for them.

On May 31, 2002, around midnight, the Ocean City Police Department responded to an alarm call from the closed-for-the-night Hooters Restaurant and Bar merchandise store on 122nd Street in Ocean City. There they found Erika and Benjamin loading Hooters merchandise into their Jeep Cherokee. The couple were placed in handcuffs. Upon searching the couple, the police found a 9 millimeter handgun and a knife on Benjamin and a fully-loaded .357 magnum revolver tucked into Erika's blue jeans in the small of her back. Another knife was found on Erika. Discovered in the Sifrits' car were a .45 calibre gun, ski masks, flex cuffs, and tape.[4] The two were arrested and charged with burglary.

At the scene of the burglary, Erika told the officers that she had anxiety problems and that she needed her Xanax and Paxil from a brown leather pouch in her purse located in the front of the Jeep. One of the police officers, Sgt. Beene, looked in Erika's purse for the pills. He found only one type of pill inside the brown leather pouch. Sgt. Beene continued to look for the other type of pill inside a red pouch because he noticed medicine bottles in that pouch. When the officer did not find the second type of pill in the red pouch he looked in a zippered pouch in the back of the purse. There he discovered four spent .357 magnum shell casings and one live round. The sergeant continued to look for the second type of pill in a gray change purse, also inside Erika's purse, and found the identification cards of Mr. Ford and Ms. Crutchley.[5] Fearing for the

---

4. Investigators later found other items in the Jeep including but not limited to a knife, gloves, and undeveloped film.

5. There was also a silver ring with a dragon engraving found in Erika's purse that was later identified as belonging to Mr. Ford. DNA testing

safety of Ms. Crutchley and Mr. Ford, the police ordered an immediate search of the Sifrits' condominium.

Upon entering the Sifrits' condominium, the police observed photographs and two bullets on a glass table. The pictures were of the Sifrits, Ms. Crutchley, and Mr. Ford, taken before the murders. Both of the bullets on the table had been fired from the .357 magnum recovered from Erika at Hooters, and one of the bullets had Mr. Ford's blood and tissue on it. Police also found a key to Ms. Crutchley and Mr. Ford's condominium on another table. Crime scene technicians found bloodstains in the Sifrits' master bathroom on the top of the counter, the underside of the counter top, the floor, the floor under the vanity, the back side of the bottom drawer of the vanity, under the mirror, under the baseboard, under the hot tub faucet, on the hot tub step, on a sailboat candle holder on the hot tub, on the window, and in the shower. Swabs were taken from these bloodstains, which were all later identified as matching the DNA of either Ms. Crutchley or Mr. Ford. There was also a hole in the back wall of the bathroom, fresh paint on the wall, and numerous cleaning supplies on the floor next to the bathroom door. The cleaning supplies, it was later discovered, had been purchased on Sunday, May 26, 2002, the day after Martha Crutchley and Joshua Ford were murdered.

The police ultimately found the dismembered bodies of Martha Crutchley and Joshua Ford in a Delaware landfill. The only part of Ms. Crutchley that was recovered was her left leg, consequently, her cause of death was never determined. Police recovered the torso and both arms of Mr. Ford. Two bullets fired from the .357 magnum recovered from Erika at Hooters on the night of the burglary were found in Mr. Ford's torso.

_____

revealed blood from both Joshua Ford and Martha Crutchley on the ring. Ms. Crutchley was a major contributor to the DNA sample found on the ring and Mr. Ford was a minor contributor, according to a forensic chemist for the State of Maryland.

The State's theory in both cases was that after leaving Seacrets that night, the two couples had returned to the Sifrits' condominium. Once in the condominium, the Sifrits engaged in a "missing purse game" in which they claimed Erika's purse was missing. They demanded the other couple find the purse and when it couldn't be found, somehow got them into the upstairs bathroom where both Sifrits shot Mr. Ford and in some other manner killed Ms. Crutchley. The team then cut up the victims' bodies and disposed of them in trash dumpsters.

The State's theory is based, in part, on the testimony of Melissa Seling ("Melissa") who met the Sifrits the night of May 29 through her friend, Justin Todd Wright ("Todd"). Melissa testified that when she caught up to Todd that night, he and the Sifrits were intoxicated and she was the only one who was sober. Melissa joined the Sifrits and Todd at a couple of bars, but she did not drink. At the end of the evening, Melissa was worried about Benjamin's ability to drive so she agreed to follow the Sifrits back to their condominium. When the four of them arrived at the condominium, Melissa, at Benjamin's urging, helped Erika up to the condominium because she seemed so intoxicated that she might fall over without help. Once at the door, Erika located her keys in her purse and opened the door with no problem. Erika began showing Melissa around the condominium. Within 5–10 minutes of having the purse at the door, Erika and Benjamin claimed that someone had taken Erika's purse and that Melissa had to look for it.

At some point during the search for the purse, Benjamin brandished a gun and became more adamant about them finding the purse. Benjamin made a number of statements during the search regarding people who had been there before who had tried to rip them off and that he was "doing the world a justice by ridding the earth of bad people." Melissa testified that he also told her "if we ripped them off ... he would kill us the same way he killed those other people." In her statement to police and on re-cross-examination in Benjamin's

trial, Melissa acknowledged that she was not clear in her recollection of whether Benjamin had said "just like *I* killed the other people" or "just like *we* killed the other people" (emphasis added). Melissa testified that she felt threatened by the gun and asked that it be put away. During the search, Melissa noticed a bullet hole in the bathroom door, which had been removed from its hinges. Ultimately, Benjamin discovered the purse in a location that had previously been searched. Benjamin also sat down with Melissa to show her his gun and what he called Erika's gun, the .357 magnum used to kill Joshua Ford.

At his trial, Benjamin took the stand in his own defense. He denied any involvement in the actual killing of the two victims. Benjamin testified that he left Seacrets with his wife, Martha Crutchley, and Joshua Ford and got on a bus. When the bus stopped at the condominium where Ms. Crutchley and Mr. Ford were staying, Erika got off the bus with them while Benjamin returned to their condominium alone. Once there, however, Benjamin realized he did not have a key to the unit, so he went and "passed out" in the couple's jeep. At some time later, Benjamin claims his wife woke him up in the car asking "why weren't you there for me?" The two then returned to the condominium where he found Joshua Ford and Martha Crutchley dead on the bathroom floor. Benjamin admitted that it was his idea to dismember the bodies and that Erika helped him. He testified that he cut off both Ms. Crutchley's and Mr. Ford's heads, arms, and legs about an hour after they were killed. He then placed their body parts in trash bags, which Erika purchased for that purpose that morning while Benjamin dismembered the bodies, and then dumped their remains in a dumpster at a Food Lion in Rehoboth, Delaware, at around 8 a.m. or 9 a.m. on Sunday, May 26, 2002.

Benjamin was sentenced to thirty years imprisonment for second degree murder, 25 years to run concurrent for first degree assault, and 5 years to run consecutive for accessory

**128**

after the fact.[6]

Additional facts will be provided throughout this opinion as necessary to our analysis.

## II.

### *Inconsistent Theories of Prosecution*

Benjamin presents the same facts and argument as Erika Sifrit with regard to the issue of inconsistent theories of prosecution. For the reasons stated in our opinion filed in the case of Erika Sifrit, we find no merit to Benjamin's contentions. *See Erika Sifrit v. State,* 380 Md. 232, 844 A.2d 428.

## III.

### *Admission/Exclusion of Evidence*

Benjamin's second and third assignments of error relate to the admission and exclusion of certain testimony; specifically, the admission of Michael McInnis's testimony regarding the conversation about disposing of a dead body and the exclusion of testimony by Benjamin's mother that Erika once pulled a gun on her.

It is well established in this State that the admission of evidence is committed to the considerable discretion of the trial court. *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432, 439 (1997) (internal citations omitted). Relevant testimony is generally admissible and irrelevant testimony is not admissible. *Id.* (citing Md. Rule 5–402). Evidence is relevant if it has a tendency to establish or refute a fact that is at issue in the case. *Merzbacher,* 346 Md. at 404, 697 A.2d 432 (citing Md. Rule 5–401). "We are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a

---

6. In a separate trial, Erika was convicted of the first degree murder of Mr. Ford, second degree murder of Ms. Crutchley, and theft charges related to the burglary at Hooters. She was sentenced to life imprisonment for the first degree murder of Joshua Ford, 20 years to run consecutive for the second degree murder of Martha Crutchley, and 18 months to run concurrent for the theft charges.

specific rule or principle of law or there is a clear showing of an abuse of discretion." *Merzbacher*, 346 Md. at 404–405, 697 A.2d at 439 (citing *White v. State*, 324 Md. 626, 637, 598 A.2d 187, 192 (1991)). In *Dorsey v. State*, 276 Md. 638, 643, 350 A.2d 665, 668–669 (1976), we discussed the test for admissibility of evidence in a criminal trial. We said:

> The real test of admissibility of evidence in a criminal case is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue. . . . [E]vidence, to be admissible, must be relevant to the issues and must tend either to establish or disprove them. Evidence which is thus not probative of the proposition at which it is directed is deemed irrelevant.

(Internal quotations and citations omitted.)

## Admission of Michael McInnis's Testimony

■■ The trial court admitted the testimony of Michael McInnis ("McInnis") regarding a conversation he had with Benjamin in 1999. The Court admitted the testimony pursuant to Md. Rule 5–404(b), governing the admission of evidence related to other crimes, wrongs, or acts. Benjamin challenges the admission of this testimony. We affirm the trial judge's decision to admit the evidence pertaining to Benjamin's statement, but for different reasons.

McInnis is a former Navy SEAL and friend of Benjamin. He was called by the State at Benjamin's trial to recount a conversation that he had with Benjamin. McInnis testified that in 1999 the two men were at a strip club having drinks when the discussion turned to how Benjamin would dispose of a body if he ever killed someone. According to McInnis, Benjamin stated that he would do it by laying down plastic in a living room or an open space and then remove the arms, legs and head with a knife. Then he would remove the body in separate bags and dispose of the body in either the same dumpster over the course of a month or in different dumpsters throughout the city in a single trip. On cross-examination, McInnis stated that the conversation was a typical conversation between SEALs, that they were "simply talking trash

with guys over a few beers" and that the conversation was not to be taken seriously. Outside the presence of the jury, McInnis testified that the conversation had, in fact, arisen when McInnis stated to Benjamin, "I should send you to go whack my wife." To which, Benjamin responded, "[y]eah sure." The conversation then turned to the discussion of how it could be done without getting caught. That is when the discussion about quartering and disposing of the bodies arose. Later, McInnis asked what the going rate was, and Benjamin responded "$20,000 to $40,000, $30,000."

On April 1, 2003, counsel for Benjamin made an oral motion to exclude the testimony of McInnis. The defense argued that the conversation did not amount to another crime, wrong, or act. The conversation was just "a drunken discussion three years ago." The State countered that the act of offering to kill someone's wife for money constitutes solicitation to commit murder, which is a crime. The Court took a brief recess and then made an initial ruling that the testimony qualified under Md. Rule 5–404(b); however, before a final determination could be made on whether to admit the testimony, a hearing was necessary outside the presence of the jury.

Following the hearing, the trial court held that the testimony was admissible pursuant to Rule 5–404(b), based on its interpretation that the conversation amounted to an offer or solicitation to commit murder. The trial court, relying on the case of *Ridgeway v. State,* 140 Md.App. 49, 67, 779 A.2d 1031, 1041 (2001), *aff'd,* 369 Md. 165, 797 A.2d 1287 (2002), conducted the required three-part analysis regarding the admissibility of "other crimes" testimony and concluded that it was admissible. The testimony was admitted, without any reference to the statement about "whacking" McInnis's wife. Additionally, the court gave a cautionary instruction to the jury regarding the proper use of the testimony.[7]

---

7. Following McInnis's testimony, the court gave the following instruction to the jury:

You have heard evidence just now that the Defendant had a conversation with Mr. McInnis, discussing with Mr. McInnis how to dispose of

Benjamin contends that the trial court erred in admitting this testimony because it "simply did not qualify as relevant evidence, as it neither 'tended to make the proposition asserted more or less probable,' nor was [it] 'related logically to the matter in issue in the case.'" He further argues that the testimony does not fall within any of the stated exceptions embodied in Rule 5–404(b) and relied upon by the trial court. On appeal, the State contends that the conversation did not amount to "prior bad acts" evidence because the version actually admitted at trial, the version without reference to "whacking" McInnis's wife, did not fall within the exceptions for the admission of character evidence. We agree with the State that evidence of the conversation between McInnis and Benjamin did not constitute "other crimes" or "prior bad acts evidence." Further, we agree that the evidence was relevant and admissible.

For testimony to be admissible it must be relevant. Md. Rule 5–402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." Md. Rule 5–401. Benjamin's declaration is admissible as circumstantial evidence tending to prove that he later committed the murder. *See Kirkland v. State*, 75 Md.App. 49, 54, 540 A.2d 490, 492, *cert. denied*, 313 Md. 506, 545 A.2d 1344 (1988) (Affirming that "the *Hillmon* doctrine provides that when the performance of a particular act by an individual is an issue in the case, his intention (state of mind) to perform that act may be shown.... The *Hillmon* doctrine allows the trial court to admit [a defendant's] statement as circumstantial evidence that [the defendant] carried out his intention and performed the act.") *Id.* at 56, 540 A.2d at 493 (citing *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892) (Holding that when the

a body if someone had been murdered. You may consider this evidence only—you may consider this evidence only as to the question of identity and a plan but not as to guilt or innocence.

The Court then repeated the warning regarding the proper use of the evidence.

performance of a particular act by an individual is an issue in the case, his intention to perform that act may be offered as circumstantial evidence that the individual later acted in accordance with his intention.)). Applying this standard to the evidence in question, we find the testimony of McInnis relevant. The evidence did more than suggest to the jury that Benjamin was either a bad person or had a propensity to commit violent crimes. Even though Benjamin's trial counsel conceded during his opening statement that Benjamin dismembered and disposed of the bodies of Martha Crutchley and Joshua Ford, the evidence of the earlier conversation between McInnis and Benjamin tended to show that Benjamin's participation in the homicide was not necessarily limited to the disposal of the bodies. Whether the three-year-old conversation was a joke or a serious statement and whether Benjamin participated in the killing as a principal or only as an accessory to homicide, were questions left to the jury for resolution.

■■■■ The trial judge, however, based his decision to admit the evidence of Benjamin's prior statements on Md. Rule 5–404(b). That rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

Md. Rule 5–404(b) is designed to prevent the jury from becoming confused by the evidence, from developing a predisposition of the defendant's guilt, or from prejudicing their minds against the defendant. *State v. Faulkner*, 314 Md. 630, 633, 552 A.2d 896, 897 (1989) (internal citation omitted). Evidence of other crimes is admissible "if it is substantially relevant to some contested issue in the case and if it is not offered to prove the defendant's guilt based on propensity to commit crime or his character as a criminal." *Faulkner*, 314 Md. at 634, 552 A.2d at 897–98.

■ Before other crimes evidence is admitted, a three-part determination must be made by the trial court. The first required determination is whether the evidence fits within one or more of the stated exceptions to Rule 5–404(b). *Faulkner,* 314 Md. at 634, 552 A.2d at 898. This is a legal determination that does not involve any exercise of discretion. *Id.* The second requirement is that the trial court determine whether the defendant's involvement in the other act has been established by clear and convincing evidence. *Id.* We review the trial court's decision to determine if there is sufficient evidence to support it's finding. *Faulkner,* 314 Md. at 635, 552 A.2d at 898. Lastly, the trial court must weigh the probative value of the evidence against any undue prejudice that may result from its admission. *Id.* This determination involves the exercise of discretion by the trial court. *Id.*

As previously discussed, the trial court concluded, based on the testimony offered at the hearing on the motion *in limine* that the offer to "whack" McInnis's wife amounted to "other crimes" evidence. Consequently the court conducted the three part test we recognized in *Faulkner.* The State and Benjamin agree that the trial court erred in applying the *Faulkner* analysis.

In *Klauenberg v. State,* 355 Md. 528, 549, 735 A.2d 1061, 1072 (1999) this Court first addressed the issue of what constitutes a wrong or an act under Rule 5–404(b). We began by noting that "[a]n act prohibited by the criminal code but which goes uncharged is perhaps easy to identify as a bad act, hence the term 'uncharged misconduct.'" *Id.* at 547, 735 A.2d at 1071. We then noted that some acts do not have a negative connotation until placed in context. *Id.* We have held that mere possession of a knife and walking behind a women are not crimes, but under certain circumstances, " 'these acts could be construed as misconduct.' " *Id.* (quoting *Whittlesey v. State,* 340 Md. 30, 58, 665 A.2d 223, 237 (1995)). We have also held that a criminal defendant's plan to leave the State to evade prosecution could constitute a bad act. *Klauenberg,* 355 Md. at 547, 735 A.2d at 1070 (citing *Whittlesey,* 340 Md. at 63, 665 A.2d at 239). And we have held that even though solicita-

tion of a prostitute for sex is a crime, testimony that the defendant "got a girl and had sex" did not amount to a crime or bad act absent an indication that the girl was a prostitute or an unwilling partner. *Klauenberg*, 355 Md. at 548, 735 A.2d at 1070 (citing *Burch v. State*, 346 Md. 253, 270–71, 696 A.2d 443, 452, *cert. denied*, 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997)).

Based on our review of Maryland case law and that of a number of other jurisdictions we concluded that:

> In reviewing the holdings from other jurisdictions and examples of what those courts construed as bad acts, the general theme running through each is that a bad act is an activity or conduct, not necessarily criminal, that tends to impugn or reflect adversely upon one's character, taking into consideration the facts of the underlying lawsuit. It is from this general proposition that we evaluate whether the evidence to which appellant protests as erroneously admitted were bad acts under Maryland Rule 5–404(b).

*Klauenberg*, 355 Md. at 547, 735 A.2d at 1071. In *Klauenberg*, we held that evidence that Klauenberg was involved in an underlying estate case with his sister, stood near a location where a gun was stored in a ceiling tile while the house was being searched by police, verbally confronted and poked the opposing attorney in the civil lawsuit, and was found with two guns and ammunition on his person, did not constitute bad acts. We reasoned that none of these actions, as they were presented to the jury, "impugn someone's character." Therefore, they were not "bad acts" within the meaning of 5–404(b). *Id.* at 550, 735 A.2d at 1072–73.

The testimony in question here was that two men, McInnis and Benjamin, were in a strip club one night discussing how Benjamin would dispose of a dead body if he ever killed someone. Although the conversation may appear to be unusual, the conversation neither amounts to a crime nor impugns Benjamin's character to the extent that Rule 5–404(b) is implicated. We hold that the trial court was only required to determine whether the testimony was relevant and whether its

probative value was outweighed by its prejudicial effect. By engaging in the three-step analysis approved in *Faulkner*, the trial judge afforded Benjamin greater protection than was necessary.

Furthermore, Benjamin's argument that he was harmed by admission of the testimony of McInnis is tenuous considering his trial counsel's concession in his opening statement. In the present case, trial counsel conceded that Benjamin dismembered the bodies and disposed of them in dumpsters. This admission was not solely relevant to the crime of accessory after the fact. Benjamin's prior conversation was relevant circumstantial evidence of his intent or plan as well as evidence of the identity of the perpetrator. The jury could reasonably infer from the details contained in Benjamin's comments, the specific manner in which he likely would conceal a murder, and that, coupled with other substantial (and indeed conceded) evidence of his involvement in the dismembering and disposition of the bodies, he was also involved in the killing. Moreover, the jury could reasonably conclude from Benjamin's conversation with McInnis that Benjamin either planned or contrived a scheme to murder the victim in this case. Under the circumstances, the jury could reasonably infer that Benjamin's participation in the murder was not impulsive and that the murder was the result of a conscious design to kill. In addition, because Benjamin admitted his involvement as an accessory after the fact, the jury was not precluded from reasonably inferring from the evidence that his role was more extensive than he indicated. The jury was free to believe some, all, or none of the evidence presented in this case. Therefore, the testimony of McInnis was relevant without offering it to show either Benjamin's propensity to commit crime or that Benjamin is a bad person. Thus, we affirm the trial court's decision to admit the evidence of Benjamin's prior statements about dismembering and disposing of bodies. Although we reject the trial judge's conclusion that the evidence amounted to "other crimes" evidence, we discern no reversible error as a result of that decision.

### Exclusion of Elizabeth Sifrit's Testimony

Benjamin also challenges the trial court's decision to prevent Elizabeth Sifrit, Benjamin's mother, from testifying regarding an incident that allegedly occurred with Erika in North Carolina. The defense proffered that Elizabeth would testify that Erika became hysterical following a military hearing involving Benjamin, "pulled a gun" on Elizabeth, locked herself in the bathroom, and that Elizabeth called 911. Counsel for Benjamin argued to the trial court that the testimony was being offered to show "simply that there's another incident of [Erika] Sifrit pulling a gun on another human being." The Court ruled that the testimony was "not relevant."

Benjamin now argues that the testimony was relevant to show that Erika "was capable of pulling a weapon on another individual outside of [Benjamin's] presence" and had the tendency to show that she was capable of committing the present crimes alone. This argument, however, was not presented to the trial court and is not preserved for our review. *See Brecker v. State*, 304 Md. 36, 39–40, 497 A.2d 479, 480 (1985) ("[O]ur cases have consistently stated that when an objector sets forth the specific grounds for his objection ... the objector will be bound by those grounds and will ordinarily be deemed to have waived other grounds not specified.").

Arguably, the theory now advanced by Benjamin is simply a more detailed version of the one advanced at trial. To accept this argument, however, we would have to require trial courts to imagine all reasonable offshoots of the argument actually presented to them before making a ruling on admissibility. We decline to place such a substantial burden on the trial court. Based on the argument presented during trial to support the admission of Elizabeth Sifrit's testimony, we conclude that the trial court did not err in excluding the testimony. Whether Erika once pulled a gun on someone does not have a tendency to show that she was the sole perpetrator of these heinous crimes.

## IV.

### *Merger*

 The last issue presented for our review is whether the trial court erred in imposing separate sentences for Benjamin's convictions for second degree murder and first degree assault.[8] The State agrees that merger is required in this case. We agree as well and shall vacate the sentence for Count Three, first degree assault, and merge, for sentencing purposes, Count Three into the conviction for Count One, second degree murder.

 "Under the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution, the State can neither hold multiple trials nor punish a defendant multiple times for the same offense." *Holbrook v. State*, 364 Md. 354, 369, 772 A.2d 1240, 1248 (2001) (internal citations omitted). "Offenses merge and separate sentences are prohibited when, for instance, a defendant is convicted of two offenses based on the same act or acts and one offense is a lesser-included offense of the other." *Khalifa v. Maryland*, 382 Md. 400, 855 A.2d 1175 (2004). The normal test for determining if an offense merges into another is the "required evidence test." *State v. Jenkins*, 307 Md. 501, 518, 515 A.2d 465, 473 (1986).[9] It is the "threshold" test and, if it is satisfied, merger follows as a matter of course. *Khalifa*, 382 Md. at 433, 855 A.2d at 1194. The test looks to the elements of the offenses and "if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter." *Jenkins*, 307 Md. at 518, 515 A.2d at 473. Merger may also be appropriate even when two offenses do not satisfy

---

8. The trial court imposed a thirty-year sentence for Benjamin's conviction for the second degree murder of Martha Crutchley and a concurrent twenty-five-year sentence for his conviction for first degree assault of Ms. Crutchley.

9. This test is also referred to as the "same evidence test" and the "*Blockburger* test."

the required evidence test. "[E]ven though offenses may be separate and distinct under the required evidence test, courts occasionally find as a matter of statutory interpretation that the legislature did not intend, under the circumstances involved, that a person could be convicted of two particular offenses growing out of the same act or transaction." *Id.* at 518, 515 A.2d at 473 (internal citation omitted).

■ The crime of murder in Maryland remains a common law offense. *Mitchell v. State,* 363 Md. 130, 146, 767 A.2d 844, 853 (2001). By statute, it has been divided into two degrees. *Id.* Here, the trial court, in instructing the jury, said:

In order to convict the defendant of second degree murder, the State must prove that the conduct of the defendant caused the death of Martha Crutchley and Joshua Ford; that the defendant engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result.

At the time of the murders, first degree assault was punishable under Md.Code (1957, 1996 Repl.Vol.), Art. 27 § 12A–1, which provides:

(1) A person may not intentionally cause or attempt to cause serious physical injury to another.

(2) A person may not commit an assault with a firearm.

"Serious physical injury" includes "physical injury which creates a substantial risk of death." *Id.* at § 12(c)(1). Here, the trial court instructed the jury on both modalities of proving assault.

Applying the required evidence test to § 12A–1(1), we conclude that, for sentencing purposes, assault in the first degree merges with the crime of second degree murder. The two crimes have the same elements with the one additional element for murder, the death of the victim. The result is not the same when applying the required evidence test to § 12A–1(2), as it requires the use of a firearm which is not required for second degree murder. We note, however, that the jury found Benjamin not guilty of both counts of use of a handgun in a crime of violence or commission of a felony, so it is

unlikely that they relied on § 12A–1(2) in finding Benjamin guilty of first degree assault. Nevertheless, we conclude that, based on the rule of lenity, even if the jury based its conviction for first degree assault on the second modality, the conviction would still merge. Based on the facts of the case we do not believe that the legislature intended for a person to be convicted of these two offenses which arose from the same act. We therefore hold that Benjamin's conviction for first degree assault should have been merged into his conviction for second degree murder for sentencing purposes.

**SENTENCE FOR COUNT THREE VACATED. JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY OTHERWISE AFFIRMED.**

**PETITIONER TO PAY COSTS.**