897 A.2d 296

**George Raymond McINTYRE**

v.

**STATE of Maryland.**

**No. 2206, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

April 28, 2006.

506

508

John L. Kopolow (Nancy S. Forster, Public Defender, on the brief), Baltimore, for appellant.

Devy Patterson Russell (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Panel: SALMON, KENNEY, THEODORE G. BLOOM (Ret., Specially Assigned), JJ.

SALMON, J.

George McIntyre was convicted by a jury in the Circuit Court for Wicomico County of forty-seven counts of possession of child pornography and two counts of distribution of child pornography.[1] The court imposed a one-year sentence as punishment for McIntyre's conviction of one of the possession of child pornography counts but imposed no sentence for the conviction of the remaining forty-six possession counts. The court merged the two distribution of child pornography counts for purposes of sentencing and imposed a sentence of three years on that count but suspended all but one year of that sentence and ran it concurrently with the sentence imposed for the conviction on the possession count.

In this appeal, McIntyre makes five main arguments as to why his convictions should be reversed, viz.,

1.  The motions court erred in denying his motion to suppress the statement he gave to a Maryland state police officer on the morning the police searched his home.

---

1.  The jury acquitted McIntyre of seven counts of possession of child pornography.

2.  The trial court erred in denying his counsel's motion for judgment of acquittal as to the counts in the indictment charging him with possession of child pornography because there was insufficient evidence that he ever possessed the two computer disks depicting child pornography.

3.  The trial court committed reversible error when it denied McIntyre's counsel's motion for mistrial that was based on the fact that a Maryland state trooper gave testimony suggesting that McIntyre previously had been accused of misconduct similar to that for which he stood trial.

4.  The trial court committed reversible error when it denied McIntyre's motion for judgment of acquittal due to the fact that the prosecution failed to offer any evidence that the images for which he was being prosecuted were, in fact, images of real children.

5.  The trial court committed reversible error when it failed to instruct the jury that it could not convict the defendant of any crime unless it found that the images depicted in various pictures that he either possessed or distributed were, in fact, pictures of real children.

## I. *BACKGROUND FACTS* [2]

Detective Joe Delfeirro, a peace officer employed by the City of Irving, Texas, Police Department, was assigned, in March 2003, to undertake a special investigation of internet child pornography. On March 20, 2003, Detective Delfeirro logged onto an America Online (AOL) chat room entitled "VY," an acronym for "very young." Based on his experience, the detective knew that the VY chat room had been set up specifically for the use of internet trading of child pornography news. The chat room also made available a list that was

---

2.  The facts set forth in Part I of this opinion are presented in the light most favorable to the State.

compiled in order to facilitate the exchange of child pornography.

Detective Delfeirro entered his email address onto the list on March 20 and immediately received an email with five images from an AOL user known as "DontTestMe197." The images were received by Detective Delfeirro on his computer in his office in Irving, Texas.[3] The five images he received were of young females and males engaging in sexual conduct.

Detective Delfeirro subpoenaed information from AOL regarding the owner of the account using the name "Dont-TestMe197." He learned that the owner was one Linda McIntyre, who lived at 33157 Shavox Road, in Parsonburg, Wicomico County, Maryland. Detective Delfeirro turned over the information he had received to Corporal Scott Cook of the Maryland State Police Department. Corporal Cook then obtained a warrant to search 33157 Shavox Road.

On May 13, 2003, the search warrant was executed at the 33157 Shavox Road address, which was a trailer approximately sixteen-feet wide and forty-feet long. Residing at that address on the date that the search warrant was executed were appellant, age twenty; appellant's mother, Linda McIntyre; his father, William McIntyre; and appellant's sister, Ashley McIntyre, age seventeen.

The trailer had two bedrooms—a master bedroom where appellant's mother and father slept and a second bedroom that belonged to Ashley. The home also contained common areas, including a kitchen and a living room. On the date the search warrant was executed, appellant had been living at his parents' home for approximately six weeks. Appellant regularly slept on a couch in the living room.

The search warrant was executed at 6 a.m., while all occupants of the house were asleep.[4] After the police announced

---

**3.** The five images were introduced into evidence at appellant's trial as State's Exhibits 62A, B, C, D, and E.

**4.** Appellant's father was not at home when the search warrant was executed.

their presence, appellant's mother, Linda McIntyre, answered the door. Corporal Cook advised Mrs. McIntyre that he had a search and seizure warrant for her residence and asked her if she knew why a warrant had been issued. She said that she did not, which prompted the corporal to advise her that the warrant concerned child pornography that had been disseminated from her computer to an undercover police officer. When she heard this, she immediately said, "My son, Georgie." She went on to explain that appellant had had "this problem" in the past and as a result AOL had closed their account because he had downloaded, or attempted to download, child pornography.

Upon entry into the residence, Corporal Cook saw appellant asleep on the couch in the living room. Two or three police officers then conducted a sweep of the house for purposes of officer safety, while appellant, his mother, and Ashley waited in the living room. Shortly thereafter, other officers commenced a search of the trailer looking for child pornographic material.

Approximately twelve minutes after the police had entered the trailer, Corporal Cook asked appellant to come outside with him so that they could talk. At that point, Corporal Cook considered appellant his "prime suspect," based upon what appellant's mother had said about his previous connection with child pornography.

Appellant agreed to go outside with Corporal Cook. At Corporal Cook's suggestion, the two agreed to talk in Corporal Cook's unmarked police vehicle. While walking to the vehicle, Corporal Cook asked appellant "if he knew what this was all about." When appellant said that he did not, Corporal Cook informed him that it concerned child pornography on the computer in the trailer. The two then got into Corporal Cook's vehicle, with Corporal Cook seated behind the steering wheel and appellant in the passenger seat.

Corporal Cook told appellant "that child pornography was ... children engaged in sexual acts with themselves, with other children, with adults." Appellant was also told that the

investigation had begun when an undercover police officer in Texas received images of child pornography. Appellant admitted that "DontTestMe197" was his password-protected screen name and that he had sent and received approximately one hundred child pornography images. Corporal Cook then asked appellant to explain how a Texas police officer received images from appellant's DontTestMe197 account. To this inquiry, appellant responded that it must have been sent accidentally.

During the interview, appellant also said "that he had maintained a list of the people on the internet that he had traded the child pornographic images with." Appellant added that he had kept the list in a file labeled "keep" but had recently deleted the list because he "didn't want to get in trouble for this shit."

Based on Corporal Cook's conversation with appellant's mother in which he had been advised that appellant previously had been in "trouble for downloading child pornography," the corporal asked appellant to explain his prior brush with child pornography law. Appellant told Corporal Cook, "I kind of know what you mean about the kids' stuff." He continued, "Some sick people sent me pictures of kids, and I sent it right back."

The conversation in Corporal Cook's automobile lasted from ten to twelve minutes. After the conversation concluded, the two walked back into the trailer. Once inside the trailer, Corporal Cook told appellant to sit on the couch with his mother and sister, and appellant complied.

During the May 13, 2003, search of the trailer, the police confiscated a computer from Ashley McIntyre's bedroom. The computer was owned by appellant's father, William McIntyre. Child pornography was found on the hard drive of that computer. The jury acquitted appellant of all charges concerning the images on that hard drive.

The police also seized three computer disks located next to the microwave oven in the kitchen. Two of the disks contained child pornography images and supplied the basis for

appellant's conviction of forty-seven counts of possession of child pornography.

Additional evidence will be discussed in order to answer the questions presented.

## II. *THE FIRST ISSUE*

As shown in Part I, *supra*, appellant made several highly incriminating statements when he spoke to Corporal Cook on the morning of May 13, 2003. Prior to making those statements, appellant was not advised of his right to silence or his right to have a lawyer represent him during his interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant filed a motion to suppress the statements he made to Corporal Cook, based on the fact that he was never advised of his *Miranda* rights.

A suppression hearing was held on September 14, 2004. The sole issue in dispute was whether Corporal Cook subjected appellant to *custodial interrogation* when he questioned him in the police cruiser. Corporal Cook was the only witness who testified at the suppression hearing. The defense produced no exhibits, nor did they introduce any other evidence to contradict the corporal's testimony.

### A. *Corporal Cook's Suppression Hearing Testimony*

Detective Cook testified that, shortly after the search warrant team entered the trailer, he asked appellant if he would accompany him outside. Appellant "did so voluntarily." He then asked appellant if he would follow him to his vehicle. Again appellant complied.

Corporal Cook walked to the driver's side of the vehicle and got in, and appellant, unescorted, walked around to the passenger side and also entered the vehicle. Corporal Cook was dressed in blue jeans and a polo shirt. He did, however, have a gun holstered on his hip and a police badge attached to his belt.

When Corporal Cook was asked whether the windows were up or down during the interview, he responded:

The windows were up and I believe remained up, I believe I started the vehicle and I may have run the air conditioner, I don't recall, whatever to make the client comfortable in there, air conditioning, heat, May would assume 6:15 in the morning, maybe the air conditioner.[5]  The doors were not locked.

Once inside the unmarked police vehicle, Corporal Cook told appellant that he was not under arrest and that he did not have to talk to him if he did not want to.  The officer then offered appellant a donut.  Appellant declined the food offer. Corporal Cook asked appellant how long he had been living at the Shavox Road address and was told that he had been there about a month and a half and that he lived there with his sister, mother, and father.

Appellant was next questioned about the current screen names he was using and asked if he knew what screen name, if any, his sister, father, and mother used.  Appellant replied that his father never used the computer.  He thought that his mother's screen name had "something to do" with her last name, but he was not sure exactly what the screen name was. He did not know what screen name his sister used.  Appellant further advised that currently his screen name was "fun-lovnswm20," and that name replaced the one he previously used, i.e., "DontTestMe197."  Appellant told Corporal Cook that all his screen names were "password protected," meaning that a person needed a password to use his particular screen name.

---

5.  Demonstrating commendable initiative, appellant's appellate counsel obtained from the National Weather Bureau information showing that, at the time and place of the police interview of appellant, it was between 53.6 and 57.2 degrees Fahrenheit;  this was done to prove that, even though the weather was already "chilly," Corporal Cook turned on the air conditioner in the cruiser.  Impliedly, at least, appellant contends that this action by Corporal Cook was done in order to create a coercive, or at least unpleasant, atmosphere for the interrogation.  But, as can be seen from the excerpt from Corporal Cook's testimony quoted above, the corporal had no recollection of whether he turned on the air conditioning.  In all likelihood, this is the reason that appellant's trial counsel never contended at the motions hearing that the cruiser was kept too cold.

According to Corporal Cook, at no time during the interview did appellant indicate that he did not want to talk with him.

After Corporal Cook's interview with appellant concluded, appellant was not immediately arrested. In fact, the arrest did not occur until April 28, 2004, which was approximately eleven-and-one-half months after the interview.

On cross-examination, Corporal Cook was asked why he did not advise appellant of his *Miranda* rights. The corporal responded that *Miranda* rights were not given because the questioning was "non-custodial."

Appellant's counsel also asked during cross-examination whether he specifically told appellant during the interview that he "was free to leave." Corporal Cook said that he was uncertain as to whether he used "those specific words," but he did remember that he specifically told appellant, "You're not under arrest and you [do] not have to talk to me if you do not wish to."

Corporal Cook also said on cross-examination that he questioned appellant's mother in the residence on May 13, 2003. He did not question Ashley, but another police officer did so. He said that he was not sure where the questioning of Ashley took place.

Corporal Cook explained that the reason he interviewed appellant in his car was that he thought that the subject they were going to be talking about (child pornography) would be one that would be "somewhat cumbersome" if his mother and younger sister were present. In the officer's words, the presence of female relatives "would hinder his [appellant's] openness."

### B. *The Motions Judge's Ruling*

Six days after the suppression hearing, the motions judge filed a written opinion and order. Citing *Bond v. State,* 142 Md.App. 219, 788 A.2d 705 (2002), and *Clark v. State,* 140 Md.App. 540, 781 A.2d 913 (2001), the Court recognized that, in order to determine whether a subject is "in custody" for *Miranda* purposes, seven factors must be considered, viz.,

(1) the location and the duration of the interview; (2) the number of police officers present; (3) what was said and done; (4) whether the defendant was physically restrained; (5) whether there was an indication of implied physical restraint, such as guns drawn or a guard at the door; (6) the manner in which the defendant arrived at the interview; and (7) whether the defendant was arrested or permitted to leave after the interview.

The motions judge then wrote:

From the distillate of the facts and the foregoing factors, the court must determine whether the suspect's freedom has been curtailed to a degree associated with formal arrest and whether a reasonable person, based on the objective circumstances surrounding the interrogation, believes that he or she is free to end the encounter and leave. *State v. Rucker*, 374 Md. 199 [821 A.2d 439] (2003).

Defendant's interrogation took place under relatively benign circumstances. The search warrant was executed during daylight hours at an hour of the day when one might expect the occupants of the residence to be awake. The Court takes judicial notice of the fact that 13 May 2003 was a Tuesday, as opposed to a Saturday or Sunday. Defendant was requested, not commanded, by Cook to answer some questions. Cook never drew his pistol from its holster. He did not handcuff Defendant. The interview took place in Cook's unmarked police car which was parked close by. No other officers were present in the car or standing guard outside the car. The questioning lasted no more than 12 minutes. Defendant was not confronted with any evidence which could ostensibly be used against him. It is also noteworthy that the Defendant's 17–year–old sister Ashley was also questioned by a police officer in a police vehicle.[6]

The motions judge then concluded that the appellant had not been subjected to custodial interrogation.

---

**6.** As mentioned earlier, Corporal Cook was not sure where Ashley was interviewed.

## C. *Analysis of First Issue*

█  In support of his contention that the statement given to Corporal Cook should have been suppressed, appellant mixes facts testified to at the suppression hearing with those introduced at trial. It is a mistake to do so. As the Court of Appeals pointed out in *Trusty v. State*, 308 Md. 658, 670–71, 521 A.2d 749 (1987), quoting with approval from *Jackson v. State*, 52 Md.App. 327, 332 n. 5, 449 A.2d 438 (1982):

> In determining whether the denial of a motion to suppress . . . is correct, "the appellate court looks to the record of the suppression hearing . . . and does not consider the record of the trial itself."

(Internal citations omitted.) To the same effect, *see State v. Carroll*, 383 Md. 438, 859 A.2d 1138 (2004); *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519 (2000); and *Lee v. State*, 311 Md. 642, 648, 537 A.2d 235 (1988).

█  Applying the seven factors set forth in *Bond* to the facts developed at the suppression hearing, we conclude that *all* seven factors favor the State's position that the questioning of appellant was not "custodial." Appellant was questioned near the trailer where he lived, and the duration of the questioning was short; only one police officer was present; according to Corporal Cook's unrebutted testimony, he was considerate toward appellant in that he offered him a donut, told him that he was not under arrest, and also advised him that he did not have to speak with the officer; the appellant was not physically restrained; the doors in Corporal Cook's vehicle were not locked; there was no indication whatsoever of "implied physical restraint," such as guns drawn or a guard at the door; appellant walked to the police cruiser unrestrained; and lastly, appellant was permitted to leave after the interview was concluded.

█  Aside from the foregoing factors favoring the State, it is important to stress that, in determining whether a suspect was in custody during police questioning, the central issue is whether "there was a restraint on freedom of movement to a degree associated with a formal arrest" such that a reasonable

man in the suspect's position would have understood that he was not free to leave. *State v. Rucker,* 374 Md. 199, 219, 821 A.2d 439 (2003). Applying that test to the facts developed at the suppression hearing, the questioning was not custodial. Appellant was told that he did not have to answer any questions and that he was not under arrest. Receipt by appellant of this information, coupled with the other surrounding circumstances, demonstrates that appellant's freedom of movement, at the time of questioning, was not restricted to a degree associated with a formal arrest, and this would have been understood by a reasonable person in appellant's position at the time of questioning.

For the foregoing reasons, we hold that the motions judge did not err in denying appellant's motion to suppress the oral statements given to Corporal Cook.

## III. *THE SECOND ISSUE*

■ Appellant contends that the evidence produced at trial was insufficient to convict him of "knowingly possess[ing]" forty-seven images of child pornography in violation of Section 11–208(a) of the Criminal Law Article of the Maryland Code (2005). The forty-seven images at issue were all found on two computer disks that were seized on May 13, 2003, from the kitchen of the trailer that appellant shared with his parents and sister. Appellant contends that the evidence offered by the State was insufficient to tie him to those computer disks.[7]

At trial, the statements appellant made to Corporal Cook on the morning of May 13, 2003, were introduced into evidence. Those statements were highly incriminating because, if taken in the light most favorable to the State and considered in conjunction with Detective Delfeirro's trial testimony, the statements showed not only that appellant was engaged in distribution of child pornography, but also that he had an avid

---

7. Appellant does not contend that the evidence was insufficient to link him with the materials that formed the basis on the distribution charges that arose due to sending pornographic images over the internet to Detective Delfeirro.

interest in that subject.[8] As will be demonstrated, appellant's admission that he had previously sent child pornography over the internet was a factor that the jury could have used legitimately in determining whether the disks at issue were possessed by appellant—as opposed to someone else who lived in the trailer.

Testimony was introduced at trial that appellant and his sister and their parents lived in a small trailer. Of the four occupants of that trailer, appellant was the only one without a private bedroom. He regularly slept on the living room couch.

In the kitchen, beside the microwave oven, the police found three computer disks, two of which contained child pornography. The three disks were found "in an area of the residence that contained the majority of the [d]efendant's personal effects." More precisely, appellant's personal effects were on the floor in the same area of the kitchen where the disks were found. Additionally, there were personal effects of appellant on a table in the kitchen. Also, "[i]n the corner of the kitchen" was a red folder, inside of which was a partially filled out application to join the United States Marine Corps. The application was by appellant, and he listed his address as 33157 Shavox Road in Parsonburg.

When appellant took the stand at trial, he admitted that when he stayed with his parents he would leave his personal belongings "in the kitchen area." He also admitted that if "someone walked into the home it wouldn't be unusual to see [his] stuff in the kitchen." He admitted to having seen the two disks in question previously but denied he had ever seen the child pornography that was on the disk.

---

8. Our standard of review when making determinations as to evidentiary sufficiency is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also State v. Suddith*, 379 Md. 425, 429, 842 A.2d 716 (2004), and *White v. State*, 363 Md. 150, 162, 767 A.2d 855 (2001).

■ In regard to the issue of whether there was sufficient evidence to prove that appellant possessed the two disks, appellant and the State both refer us to drug cases in which the issue presented was whether the state proved that the defendant had possession of controlled dangerous substances (CDS). In drug cases, the factors to be considered in determining whether the defendant had possession are as follows:

> 1) [The] proximity between the defendant and the contraband, 2) the fact that the contraband was within the view or otherwise within the knowledge of the defendant, 3) ownership or some possessory right in the premises or the automobile in which the contraband is found, or 4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

*Folk v. State,* 11 Md.App. 508, 518, 275 A.2d 184 (1971); *see also Samuels v. State,* 54 Md.App. 486, 459 A.2d 213 (1983) (applying same factors to possession of stolen goods). We have said that "[p]ossession [of CDS] need not be immediate and direct but may be constructive." *Archie v. State,* 161 Md.App. 226, 244, 867 A.2d 1120 (2005). "The fact that [items] were not found on the person of the defendant does not prevent the inference that the defendant had possession and control of those [items]." *Id.* at 245, 867 A.2d 1120.

At the time the police entered the premises, appellant was sleeping only a short distance from the kitchen. The proximity between the disks and the place where appellant was sleeping could not have been far, given the dimensions of the trailer, although the exact distance is not shown in the record. In regard to the second *Folk* factor, the disks were within the view of the appellant, and he admitted having seen them before. As to the third *Folk* factor, appellant had no possessory rights in the residence where the disks were found. The fourth factor is here most important, i.e., "the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of . . . [child pornography]." *Folk,*

11 Md.App. at 518, 275 A.2d 184. Appellant admitted to Corporal Cook that he previously had received and sent via email about one hundred images of child pornography; he also admitted to Detective Cook that he maintained a list of people with whom he had exchanged child-pornography images on the internet and that he had recently deleted the list. The statements appellant gave to Corporal Cook, coupled with appellant's admissions at trial, when added to the fact that the disks were found in the same area where appellant kept his personal belongings, constituted sufficient evidence from which a jury could infer that the computer disks were possessed by appellant.

Appellant cites three cases in support of his argument that there was insufficient evidence to link him with the disks: *Moye v. State,* 369 M' ¯ 2, 796 A.2d 821 (2002); *Taylor v. State,* 346 Md. 452, 697 A.2d 462 (1997); and *State v. Leach,* 296 Md. 591, 463 A.2d 872 (1983). Those three cases all involve charges of drug possession, and in each of those cases, it was held that the evidence was insufficient to support a reasonable inference that the defendant possessed the drugs. All of these cases are distinguishable from the one *sub judice* because in none of them was there any evidence that the defendant previously had been participating with others in the mutual use and enjoyment of the contraband. In marked contrast, there was strong evidence, if Corporal Cook was believed, that appellant was actively involved in the distribution of child pornography and the viewing of it.

For the foregoing reasons, we hold that the evidence was sufficient for a reasonable juror to conclude that the two disks (found in close vicinity to other personal property owned by appellant) were possessed by appellant.

## IV. *THE THIRD ISSUE*

Corporal Cook was asked by the prosecutor at trial what appellant had told him during the interview on the morning of May 13, 2003. During the course of answering that question, the following transpired:

[PROSECUTOR]: And did you have any further contact with [appellant]?

[CORPORAL COOK]:... I next asked the defendant about the time that he had gotten, previously gotten—

[DEFENSE COUNSEL]: Object.

THE COURT: Overruled.

[CORPORAL COOK]:—into trouble for downloading child pornography on the family's computer.

[DEFENSE COUNSEL]: Object, Your Honor, may we approach?

At an ensuing bench conference, defense counsel asserted that the testimony that the State was trying to elicit was a "prior bad act" that could not be admitted until the State "at the very least ... [proved the bad act] by [a] preponderance ... of evidence outside the jury's presence."

Testimony from Corporal Cook was then taken outside the jury's presence. He testified that, based on what appellant's mother told him, he asked appellant about a previous incident in which he "got into trouble" for downloading child pornography. Corporal Cook said that appellant told him "that AOL had canceled the internet account due to the fact that someone had sent ... [him] child pornography ... when he was sixteen years of age ... [a]nd that [the] family's account had been closed by AOL due to that."

The trial judge sustained defense counsel's objection. Immediately after the objection was sustained, defense counsel moved for a mistrial on the ground that "it's before the jury that Mr. McIntyre has a pattern [of] repeating this. It is not admissible evidence. We can't unring the bell now that it's before the jury." The trial judge denied the motion for mistrial but, at the request of appellant's counsel, gave the following curative instruction:

Ladies and gentlemen, just before you left, the officer, Corporal Cook, had made a reference to a question which he asked the defendant. I am going to strike that question. You should disregard the question, the defendant did not

answer it. You should not speculate as to what the answer may have been had the officer been able to testify to that.

■■■ "[A] mistrial is an 'extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice.' " *Coffey v. State,* 100 Md.App. 587, 597, 642 A.2d 276 (1994) (quoting *Burks v. State,* 96 Md.App. 173, 187, 624 A.2d 1257 (1993)). The necessity of a mistrial turns on whether the damage in the form of prejudice to the defendant transcended the effect of a curative instruction and deprived appellant of a fair trial. *See Rainville v. State,* 328 Md. 398, 408, 614 A.2d 949 (1992); *Kosmas v. State,* 316 Md. 587, 594, 560 A.2d 1137 (1989); *Guesfeird v. State,* 300 Md. 653, 659, 480 A.2d 800 (1984).

■■■ The decision to grant a mistrial is a matter left to the broad discretion of the trial judge because he or she is "in the best position to assess the relative impact" of the damaging testimony and whether a curative instruction will suffice. *Burks,* 96 Md.App. at 189, 624 A.2d 1257. When reviewing a denial of a motion for mistrial, we will reverse the trial court only when it is shown that "the defendant was so clearly prejudiced that the denial constituted an abuse of discretion." *Garner v. State,* 142 Md.App. 94, 102 n. 4, 788 A.2d 219 (2002).

■■■ In *Rainville v. State,* the Court discussed several factors that may be taken into consideration when deciding whether an abuse of discretion occurred. 328 Md. at 408, 614 A.2d 949. But, no single factor is determinative in any case, nor are the factors themselves the test. *Id.* (citing *Kosmas,* 316 Md. at 594, 560 A.2d 1137); *see also Guesfeird, supra,* 300 Md. at 659, 480 A.2d 800. Rather, the factors merely help to evaluate whether the defendant was prejudiced. *Guesfeird,* 300 Md. at 659, 480 A.2d 800. Some of those factors are: whether the reference to the inadmissible evidence was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon which the entire prose-

cution depends; the timeliness of the curative instruction; and whether a great deal of other evidence exists. *See Rainville,* 328 Md. at 398, 614 A.2d 949; *see also Kosmas,* 316 Md. at 594, 560 A.2d 1137 (applying the factors in a case in which the reference was to a lie detector test); *Guesfeird,* 300 Md. at 659, 480 A.2d 800 (same). Moreover, if "a curative instruction is given, the instruction must be timely, accurate, and effective." *Carter v. State,* 366 Md. 574, 589, 785 A.2d 348 (2001).

In the case *sub judice,* the curative instruction given by the trial judge was "timely [and] accurate...." *Id.* Jurors are presumed to have understood and to have followed the trial judge's instructions. *State v. Gray,* 344 Md. 417, 425 n. 6, 687 A.2d 660 (1997); *see also State v. Moulden,* 292 Md. 666, 678, 441 A.2d 699 (1982) ("[O]ur legal system necessarily proceeds upon the assumption that jurors will follow the trial judge's instruction."). The statement by Corporal Cook was a single, isolated incident. Moreover, it does not appear that the prosecutor solicited the statement when he asked, "Did you have any further contact with Mr. MnIntyre?"

In *Rainville,* upon which appellant places great reliance, the defendant was on trial for sexual assault of a female child. During the testimony of the victim's mother, she said that the defendant was in jail "for what he had done to [her son,] Michael." 328 Md. at 399, 614 A.2d 949. Although the trial judge gave a curative instruction, the Court of Appeals ruled that the statement was so prejudicial that the curative instruction was insufficient to cure the taint. *Id.* at 407, 614 A.2d 949. In the Court's view, the statement was particularly prejudicial because the defendant, though incarcerated and awaiting trial for charges involving Michael, had not been convicted of those offenses. *Id.*

This case is distinguishable from *Rainville.* Here, Corporal Cook simply testified that he asked appellant a question. There was no direct evidence, however, that appellant had previously "gotten into trouble" for that act. Nevertheless, the question did imply that appellant previously had downloaded child pornography on the family computer.

Admittedly, under some circumstances, asking someone "about the time" he had previously been in trouble for downloading child pornography on the family computer might be highly prejudicial. In this case it was not. After all, at the time the request for mistrial was requested, the jury already knew that appellant had admitted to Corporal Cook that he "had [previously] received and sent via email approximately a hundred images of child pornography."

Based on the foregoing circumstances, we hold that the trial judge did not abuse his discretion in opting to give a curative instruction, rather than granting appellant's motion for mistrial.

## V. THE FOURTH ISSUE

Appellant contends that his convictions must be reversed because the evidence produced at trial was insufficient to establish that the images depicted actual children, as opposed to virtual images of children. This contention is based upon appellant's reading of *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). The *Ashcroft* case dealt with the constitutionality of a portion of the federal Child Pornography Prevention Act (CPPA). The provision in question prohibited the possession or distribution of "sexually explicit images *that appear to depict minors* but were produced without using any real children." *Id.* at 239, 122 S.Ct. 1389 (emphasis added). As interpreted by the Supreme Court, the statute prohibited images created by "using adults who looked like minors or by using computer imaging." *Id.* at 239–40, 122 S.Ct. 1389. The Court struck down a portion of the CPPA because using virtual images of children or adults who looked like children did not involve the actual exploitation of children. The rationale for this holding was that virtual child pornography or pornographic pictures of adults who look like children are not "intrinsically related to the sexual abuse of children" in contrast to the material at issue in *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), which involved the depiction of actual

pornographic pictures of actual minors. *Id.* at 752, 102 S.Ct. 3348.

At trial, appellant never contended that the numerous pictures used to convict him were not those of real minor children engaged in pornographic acts. His defense was that he had never knowingly distributed pornographic pictures or knowingly possessed them.

When counsel for appellant moved for a judgment of acquittal at the conclusion of the State's case and later at the conclusion of the evidentiary phase of the trial, defense counsel never contended that the State's evidence was insufficient due to its failure to prove that the depictions were those of real children. The State, therefore, contends that this issue was not preserved for appellate review. There is merit in the State's argument.

In *Fraidin v. State,* 85 Md.App. 231, 244–45, 583 A.2d 1065 (1991), Judge Moylan, speaking for this Court, said:

> In a jury trial, the only way to raise and to preserve for appellate review the issue of the legal sufficiency of the evidence is to move for a judgment of acquittal on that ground. Under Md. Rule 4–324(a), a defendant is further required to argue precisely the ways in which the evidence should be found wanting and the particular elements of the crime as to which the evidence is deficient. In *State v. Lyles,* 308 Md. 129, 135 [517 A.2d 761] (1986), the Court of Appeals held clearly that a defendant is "required to state with particularity all reasons why his motion for judgment of acquittal should be granted." "Moving for judgment of acquittal on the grounds of insufficiency of the evidence, without argument, does not preserve the issue for appellate review." *Parker v. State,* 72 Md.App. 610, 615 [531 A.2d 1313] (1987). *See also Jordan v. State,* 82 Md.App. 225, 244 [571 A.2d 238], *cert. granted,* 320 Md. 312 [577 A.2d 362] (1990).

More recently in *Bates v. State,* 127 Md.App. 678, 691, 736 A.2d 407 (1999), we said: "A defendant may not argue in the trial court that the evidence was insufficient for one reason,

then urge a different reason for the insufficiency on appeal...."

In his opening brief, appellant's counsel did not even discuss the foregoing preservation problem, nor did he ask us to apply the "plain error doctrine." Appellant's failure to request that the plain error doctrine be applied in his opening brief is important because Maryland Rule 8–504(a)(5) requires a party to present argument in support of the party's position in the party's initial brief; moreover, it is necessary for the appellant to present all points of appeal in his initial brief. *See Campbell v. Lake Hallowell Homeowners Ass'n*, 157 Md.App. 504, 535, 852 A.2d 1029 (2004); *see also Beck v. Mangels*, 100 Md.App. 144, 149, 640 A.2d 236 (1994).

In appellant's reply brief, he devotes one sentence to the preservation issue. He says, "Finally, it is well settled that an error of this magnitude [failure to supply sufficient evidence to support a verdict and failure to instruct as to a crucial element of a charge] can be reviewed by this Court under the doctrine of plain error." First, it is not "well settled" that the plain error doctrine allows us to consider whether the State presented sufficient evidence to prove an element of a case, if the issue had not been raised below. So far as we have been able to determine, no Maryland case has utilized the plain error doctrine to reverse a trial judge's denial of a motion for judgment of acquittal when the ground raised on appeal was never advanced before the trial court at the time the motion for judgment of acquittal was being considered.

But, even assuming, *arguendo*, that the plain error doctrine can be stretched enough to allow us to address this issue, appellant would not prevail. For the doctrine to be applicable, the trial judge must commit some error. In this case, there was no error, plain or otherwise.

What appellant now argues, reduced to its essence, is that in a case such as this the State was required to prove either the identity of the children in the photographs (and thereafter establish their ages) or alternatively produce an expert witness to testify that the photographs were those of actual

children, rather than virtual images of children. Appellant's argument is supported by *United States v. Hilton*, 386 F.3d 13, 17 (1st Cir.2004), but that same argument has been rejected by all other federal courts that have addressed the issue.[9]

In *United States v. Kimler*, 335 F.3d 1132, 1141–42 (10th Cir.), *cert. denied*, 540 U.S. 1083, 124 S.Ct. 945, 157 L.Ed.2d 759 (2003), the Court said:

This and other circuits have made it clear that the holding in [*Ashcroft v.*] *Free Speech Coalition* is limited to the constitutionality of §§ 2256(8)(B) and 2256(8)(D)—the CPPA definitions which prohibit possessing and distributing images which were not produced using real children. *See United States v. Pearl*, 324 F.3d 1210, 1213 (10th Cir.2003) (noting that 18 U.S.C. § 2256 contained both constitutional and unconstitutional definitions of "child pornography"), *cert. denied*, 539 U.S. 934, 123 S.Ct. 2591, 156 L.Ed.2d 616 (2003) (No. 02–10597); *United States v. Kelly*, 314 F.3d 908, 911 (7th Cir.), *cert. denied*, 538 U.S. 1001, 123 S.Ct. 1923, 155 L.Ed.2d 829 (2003); *United States v. Richardson*, 304 F.3d 1061, 1063–64 (11th Cir.2002), *cert. denied*, 537 U.S. 1138, 123 S.Ct. 930, 154 L.Ed.2d 832 (2003); *United States v. Hersh*, 297 F.3d 1233, 1254 n. 31 (11th Cir.2002), *cert. denied*, 537 U.S. 1217, 123 S.Ct. 1319, 154 L.Ed.2d 1071 (2003); *United States v. Bender*, 290 F.3d 1279, 1282 n. 2 (11th Cir.), *cert. denied*, 537 U.S. 1037, 123 S.Ct. 571, 154 L.Ed.2d 457 (2002).

Despite that fact, Kimler argues that *Free Speech Coalition*, at least implicitly, also laid down the rule of evidence described above, i.e., *the absolute requirement that, absent direct evidence of identity, expert testimony is required to prove that the prohibited images are of real, not virtual, children.* He cites no authority for that proposition, and

---

**9.** By taking some words out of context from *United States v. Ellyson*, 326 F.3d 522, 531 (2003), appellant contends that the Fourth Circuit Court of Appeals had implicitly adopted the same views as expressed in *Hilton.* We reject that contention.

there is no pronouncement in *Free Speech Coalition* to that effect.

Rather, Kimler points to Congressional Findings cited by the Court in its discussion, that technological advances have made it "possible to create realistic images of children who do not exist." *Free Speech Coalition,* 535 U.S. at 240, 122 S.Ct. 1389. And, he emphasizes representations made by the government to the Court that it has become difficult to meet the burden of proof in cases involving prohibited images because of such technological advances.

*What Kimler does not note, however, is direct language by the Court that imaging technology might be good and getting better, but it is implausible to conclude that it has actually arrived at the point of indistinguishability.*

The hypothesis is somewhat implausible. If virtual images were identical to illegal child pornography, the illegal images would be driven from the market by the indistinguishable substitutes. Few pornographers would risk prosecution by abusing real children if fictional, computerized images would suffice.

*Id.* at 254, 122 S.Ct. 1389.

*We conclude that Free Speech Coalition, did not establish a broad, categorical requirement that, in every case on the subject, absent direct evidence of identity, an expert must testify that the unlawful image is of a real child. Juries are still capable of distinguishing between real and virtual images; and admissibility remains within the province of the sound discretion of the trial judge.* The only two circuits to have considered the issue take the same position. *United States v. Deaton,* 328 F.3d 454, 455 (8th Cir.2003) (per curiam) (citing *United States v. Vig,* 167 F.3d 443, 449–50 (8th Cir.1999)); *United States v. Hall,* 312 F.3d 1250, 1260 (11th Cir.), *cert. denied,* 538 U.S. 954, 123 S.Ct. 1646, 155 L.Ed.2d 502 (2003).

(Emphasis added.)

Other courts have ruled in a fashion similar to *Kimler. See United States v. Farrelly,* 389 F.3d 649, 654–55 (6th Cir.2004)

(*Free Speech Coalition* case did not impose a special or heightened evidentiary burden on the prosecution to prove that images are of real children; question is one of fact); *United States v. Slanina,* 359 F.3d 356, 357 (5th Cir.2004) (holding that the government was not required to present any additional evidence or expert testimony to meet its burden of showing that the images downloaded by defendant depicted real children, and not virtual children; moreover, the trier of fact was capable of reviewing the evidence to determine whether the government met its burden); *Deaton,* 328 F.3d at 455 (affirming the jury's conclusion that real children were depicted even though the images themselves were the only evidence the government presented on the subject); *Hall,* 312 F.3d at 1260 (holding that "no reasonable jury could have found that the images were virtual children created by computer technology as opposed to actual children"); *Vig,* 167 F.3d at 450 (holding that it was unnecessary for the government, as a part of its affirmative case, to negate what is merely unsupported speculation that the pictures showed virtual children as opposed to real ones).

Two of our sister states have also rejected the view espoused by appellant. *See People v. Phillips,* 346 Ill.App.3d 487, 282 Ill.Dec. 48, 805 N.E.2d 667 (2004) (in light of every day observation and common experience, images themselves provided sufficient proof that children in them were real); *State v. Gann,* 154 Ohio App.3d 170, 796 N.E.2d 942 (2003) (photographs and video spoke for themselves and were sufficient to prove that the depictions were that of actual children).

For the reasons set forth in *Kimler, supra,* and based on precedent from the United States Courts of Appeals from the Fifth, Sixth, Eighth, and Eleventh Circuits, and the Courts of Appeals for Ohio and Illinois, we would have rejected appellant's contention (that the State had the burden of producing expert evidence that the photographs introduced into evidence were those of actual children rather than virtual images) if the issue had been preserved.

## VI.  *THE FIFTH ISSUE*

█ In his reply brief, appellant contends that the trial court committed "plain error" when it failed to instruct the jury that it could not convict the appellant of either possession or distribution of child pornography unless it also found that the images depicted real children.

At trial, defense counsel did not object to the court's instructions on the grounds just mentioned.  The issue is raised for the first time in appellant's reply brief and is therefore not preserved.

█ But, even if appellant's counsel had objected to the trial judge's instructions, the objection would not have been meritorious.  In regard to the counts involving possession of child pornography, the State was required to show that the defendant "knowingly possessed a film, videotape, photograph, or other visual representation depicting *an individual* under the age of sixteen years" either "engaged as a subject of sadomasochistic abuse," "engaged in sexual conduct" or "in a state of sexual excitement."  Md.Code Ann., Crim. Law § 11–208 (2002) (emphasis added).  Insofar as here relevant, the trial court instructed the jury as follows:

> Now with respect to each charge of the crime of possession of child pornography the State must prove as to that particular count that the defendant knowingly possessed a film, videotape, photograph, or visual representation depicting *an individual* under the age of sixteen engaging in sexual conduct or in a state of sexual excitement.

(Emphasis added.)

As to the counts charging distribution of child pornography, the court instructed the jury, in relevant part, as follows:

> Now, with respect to each of these charges, the State must prove that the defendant knowingly promoted, distributed, or possessed with intent to distribute any matter, visual

representation, or performance which depicts *a minor* engaged in a subject of sexual conduct.

(Emphasis added.)

The above instruction tracked the language of Section 11–207 of the Criminal Law Article, which makes it illegal to, among other things, "knowingly promote, distribute, or possess with the intent to distribute any matter, visual representation, or performance that depicts a minor engaged as a subject of sadomasochistic abuse or sexual conduct." Those instructions adequately brought to the jury's attention the fact that in order to convict the defendant of possession of child pornography the depictions must be of an *"individual* under the age of sixteen." (Emphasis added.) Obviously, if the jury believed that the depictions were not of an actual child, it would not have convicted under the instruction given because the image would not be a depiction of an "individual." Likewise, in regard to the distribution of pornography count, the phrase "minor engaged as a subject in sexual conduct" plainly refers to a human being—not a cartoon or other virtual image. There was no error committed when the court instructed the jury.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**