61 A.3d 841

**William CLAYBOURNE**

v.

**STATE of Maryland.**

**No. 0443, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Feb. 28, 2013.

708

710

Allison P. Brasseaux (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD., for Appellant.

Brian S. Kleinbord (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD., for Appellee.

Panel: ZARNOCH, HOTTEN, JAMES P. SALMON (Retired, Specially Assigned), JJ.

HOTTEN, J.

Appellant, William Claybourne ("Mr.Clayborne"),[1] was indicted for first degree murder of Zachary Thompson ("Mr.Thompson"), and two related weapons offenses. During trial, appellant informed the Circuit Court for Baltimore City of his purported waiver of jury unanimity when the jury indicated that it failed to reach a unanimous decision. Appellant was convicted of first degree murder by an eleven-to-one vote and unanimously convicted of carrying a dangerous weapon openly with the intent to injure. *See* Md.Code (1957, Repl.Vol.2012), § 2–201(a) of the Criminal Law Article ("C.L.") (first degree murder);[2] C.L. § 4–101(c)(2) (carrying a dangerous weapon openly with the intent to injure).[3] During

---

1. Appellant's name appears in the record as both "William Claybourne" and "William Clayborne." Because we note that both appellant and the State indicate appellant's name as "Clayborne," we shall do the same.

2. Section 2–201(a) of the Criminal Law Article, entitled "Murder in the first degree," in relevant part, provides:
 (a) *In general.*—A murder is in the first degree if it is:
 (1) a deliberate, premeditated, and willful killing;
 (2) committed by lying in wait;
 (3) committed by poison
 \* \* \*
 (b) *Penalty.*—(1) a person who commits a murder in the first degree is guilty of a felony and on conviction shall be sentenced to:
 (i) death;
 (ii) imprisonment for life without the possibility of parole; or
 (iii) imprisonment for life
 Md.Code (1957, Repl.Vol.2012), § 2–201(a) of the Criminal Law Article (emphasis in original).

3. Section 4–101, entitled, "Dangerous weapons," in relevant part, states:

the sentencing hearing, the court imposed sentences of life imprisonment, suspending all but twenty-five years for first degree murder and three concurrent years for carrying a dangerous weapon openly with the intent to injure. Appellant noted an appeal, and presents three questions for our consideration:

1. Was Mr. Clayborne's waiver of his right to a unanimous verdict knowing and voluntary?

2. Did the trial court abuse its discretion when it permitted testimony that one of the State's key witnesses had expressed concerns about her safety?

3. Under the law of the case doctrine, was the evidence insufficient to sustain Mr. Clayborne's conviction for openly carrying a dangerous weapon?

For the reasons that follow, we (1) answer the first question in the affirmative; (2) answer the second question in the negative; and (3) decline to rule on the third question. We affirm the judgment of the circuit court.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying material facts of this case are not in dispute. The State provided critical circumstantial evidence to support its theory that Mr. Clayborne committed first degree murder. Mr. Clayborne raises no challenge to the sufficiency of the murder conviction.[4] Although the focus of this review is the waiver of appellant's right to a unanimous verdict and an

---

(c) *Prohibited.*—(1) A person may not wear or carry a dangerous weapon of any kind concealed on or about the person.

(2) A person may not wear or carry a dangerous weapon, chemical mace, pepper mace, or a tear gas device openly with the intent or purpose of injuring an individual in an unlawful manner.

Md.Code (1957, Repl.Vol.2012), § 4–101(c)(1) & (2) (emphasis in original).

4. As stated previously, we decline to rule on the sufficiency of evidence for the weapons conviction.

abuse of discretion issue, we present an overview of the trial's history for purposes of this appeal.

On April 3, 2009, at approximately 2:13 a.m., a police officer responded to 433 Watty Court in Baltimore, Maryland for a report of a fatal stabbing. The officer discovered Mr. Thompson lying on his back in the doorway of his home, suffering from an apparent stab wound to his back.[5] Following a police investigation, appellant was indicted on charges of first degree murder and two related weapons offenses.

A trial occurred between January 11 through January 19, 2011, where the State called several witnesses to establish its *prima facie* case. Valerie Leak ("Ms.Leak"), a resident of the McCulloh Homes neighborhood, which was approximately one block from 433 Watty Court, testified that at approximately 2:00 a.m. or 2:30 a.m. on April 3, 2009, appellant[6] and Mr. Thompson were arguing on her lawn, when she told them to "get the hell away from in front of my door with all that noise." Mr. Thompson removed a switchblade from his possession and swung it in appellant's direction. After this commotion, Mr. Thompson placed the blade into his pocket and walked towards his home. Ms. Leak further stated that

---

**5.** On April 3, 2009, Dr. Pamela E. Southall ("Dr.Southall"), the State's qualified expert in forensic pathology, performed the autopsy on Mr. Thompson. She noted that Mr. Thompson's injuries consisted primarily of a stab wound to the back and a cutting wound to his left forearm. Dr. Southall testified that her examination of the wounds indicated that Mr. Thompson's spine was fractured and two major blood vessels were injured. In her opinion, there had to be "considerable force" to inflict that type of damage and that anyone suffering from such an injury would have likely died within minutes. Dr. Southall also opined that the wound on Mr. Thompson's forearm was a defense wound, consistent with warding off an attack. She testified that Mr. Thompson's injuries were not consistent with an individual who was an active participant in a fight. Moreover, she confirmed that analysis of Mr. Thompson's urine and blood indicated the presence of methadone and cocaine.

**6.** Ms. Leak identified appellant in court as the man who argued with Mr. Thompson during the night in question. She stated that she knew appellant only by his nickname, "Bishop," and that she had known appellant for approximately two years.

appellant entered her home, grabbed a knife from her kitchen drawer, and proceeded outdoors.[7]

Appellant returned to Ms. Leak's home about six or seven minutes later, displayed the knife, which was covered in blood, and stated, "[t]his is what I do if somebody messes with me." Appellant retrieved his jacket from Ms. Leak's home, and never returned her knife. The police arrived and transported her to the Baltimore City Homicide Unit, where she was interviewed and identified appellant's picture from a photo array of possible suspects.

Angela Gibbs ("Ms.Gibbs") testified that she was good friends with Mr. Thompson, and had known him and Ms. Leak for approximately one to two years. She was also friends with appellant, but had only known him for two months. However, she noted that he occasionally visited her home. Ms. Gibbs was in the neighborhood on the night in question, seeking to partake in a drug transaction. As she neared Ms. Leak's house, she observed Ms. Leak engaged in a dispute with a man. She noticed Ella Gregg ("Ms.Gregg"), Mr. Thompson's girlfriend, "banging on [Ms. Leak's] door asking [Ms. Leak], what's going on? Who was that?"

Ms. Gibbs admitted that she had previously indicated to the police that she witnessed the murder of Mr. Thompson, but stated in court that she had not "witness[ed] that exactly," and was under the influence of drugs at the time. She explained that subsequent to Mr. Thompson's murder, she had been arrested and that the police indicated to her that if she possessed information "about a murder or anything" that she could be released from jail. She was then interviewed by Detectives Aaron Pittman ("Det.Pittman") and Art Brummer ("Det.Brummer") on May 14, 2009, and she stated the following: [8]

---

7. The record indicated that in Ms. Leak's pre-trial statements, she failed to inform the police that appellant obtained the knife from her kitchen.

8. The court permitted the jury to hear portions of the tape recording of Ms. Gibbs' interview with police. A transcript was marked as State's

[DET. PITTMAN]: Ok it was brought to our attention that you had information regarding the uh incident that took place on Walley [sic][C]ourt[.]

[MS. GIBBS]: Yes.

\* \* \*

[DET. PITTMAN]: Ok, ok ma'am can you explain for if anything that you saw or witnessed?

[MS. GIBBS]: We was all sitting at the table getting high[.] Zack came in threw two pills on the table, Bishop picked them up and Zack said "man put, put my shit down," he put it down. Bishop said "man you don't have to come at me like that." Zack said "if you want to purchase something you just tell me and I'll go back and get it, but put those down[.]" [U]h, they got to arguing, and as they got to arguing[,] uh[,] Zack turned around and go [sic] out the door and Zack went out the door[.] Peaches [9] gave Bishop the knife, Bishop stabbed Zack in the back, [and] he stabbed Zack, uh, Bishop was stumbling towards his house. A[sic] he was stumbling towards his house[,] he fell again and Bishop had hit him again in his back, he was banging on the door front. Manny, Manny never respond [sic], but his girl did and she told Bishop "you had killed my man," but by then we don't [sic] know if, if Zack was dead or not. We don't [sic] think he was. Came [sic] the paramedics came and she stand [sic] out.

During trial, Ms. Gibbs noted that she falsified information regarding witnessing the murder because she believed that she would be released from jail.[10] She clarified that while Dets. Pittman and Brummer interviewed her, she was not

exhibit # 8 for identification purposes. The jury heard the recording, which corresponded to the section of the transcript reproduced here, but was not transcribed in the record.

**9.** Ms. Leak confirmed that she is often called by her nickname, "Peaches."

**10.** Det. Pittman testified that he interviewed Ms. Gibbs, and noted that she never indicated that she did not witness the event.

promised anything in exchange for her information concerning Mr. Thompson's murder, and that she never received any personal benefit from her participation in the investigation.

In light of the inconsistencies between Ms. Gibbs' testimony and her statements to the police, the State, over objection, questioned Ms. Gibbs regarding her concern about being a witness:

[STATE'S ATTORNEY]: Ms. Gibbs, isn't it true that in the meeting on July 1, 2009 you expressed concerns for your safety if you were a witness in this case? I need you to answer yes or no[.]

[MS. GIBBS]: Yes.

[STATE'S ATTORNEY]: And isn't it true, Ms. Gibbs, that during that meeting on July 1, 2009, based on those same concerns you specifically requested a referral to the Victim Witness Assistance Unit?

[MS. GIBBS]: Yes.

The State also presented testimony of Ms. Gregg. She testified that she was Mr. Thompson's girlfriend, and that they resided in the same household. On the night in question, Ms. Gregg found Mr. Thompson lying unresponsive on the floor. She proceeded to the door and observed a man walking away from her home with a shiny object in his hand. She then scanned the neighborhood and noticed the same man standing in front of Ms. Leak's house. However, when she spotted him, he ran. Ms. Leak indicated that the man's name was "Bishop." [11]

Appellant was arrested on April 17, 2009, and acknowledged that his nickname was "Bishop." He explained to the police that he had a verbal disagreement with Mr. Thompson over a drug transaction involving the purchase of some "ready." [12]

---

11. During trial, Ms. Gregg identified appellant as the man she observed during the night in question.

12. The Court of Appeals has recognized that "in street parlance 'ready' signifies smokeable cocaine base, also known as rock cocaine, a different product than powder cocaine." *State v. Evans,* 352 Md. 496, 504,

Appellant told police, however, that the disagreement occurred early in the day and recited his alibi to the police.[13] Appellant stated that he socialized with others throughout the day, but refused to identify them.

Jocelyn Carlson, a forensic examiner, testified that in analyzing Mr. Thompson's fingernail clippings, she found that they yielded a DNA profile consistent with a mixture of Mr. Thompson's and appellant's DNA. She further indicated that the chances that an unrelated individual in the African American population could have been a contributor to that mixture was approximately one in 34.2 million.

At the conclusion of the State's case, appellant's counsel motioned for judgment of acquittal:

[APPELLANT'S COUNSEL]: Well, I'll—as to count one I'll submit. As to counts two and three, the only direct testimony we have regarding a deadly weapon in either case is from Ms. Leak and Ms. Gregg. Actually I guess Ms. Gibbs also testifies.

I know that's an issue of credibility, which therefore is in the province of the jury but I would proffer to the Court simply that, particularly Ms. Gibbs, the credibility is so suspect that I believe it should not get to the jury and other than that, Your Honor, I'll submit.

The court denied appellant's motion regarding the counts for murder and for carrying a dangerous weapon with the intent to injure, finding that ample evidence existed through which the jury could find the elements of those offenses. During the close of the defense's case, appellant's counsel renewed his motions for judgment of acquittal concerning the

n. 4, 723 A.2d 423 (1999), *overruled in part by Belote v. State,* 411 Md. 104, 981 A.2d 1247 (2009).

13. Appellant explained that he visited several places in Baltimore, including the Elks Club from 5:00—6:00 p.m. to watch basketball. After this, he visited the Bruce Manor Apartments to "get high," then returned to the Elks Club from 10:00—11:00 p.m, and lastly to Casino Liquors.

remaining counts. The motions were again denied by the court.

On January 14, 2011, before 3:00 p.m., the jury began its deliberations. Later, after failing to reach a unanimous decision, and with agreement of the parties, the jury was released for the three-day weekend and resumed deliberations on the following Tuesday. On January 18, 2011, after several hours of deliberations, the trial judge received a note from the jury, which read, "[w]e respectively cannot reach a unanimous decision on the counts." After a discussion with the parties, the court issued the pattern "duty to deliberate" instruction to the jury,[14] stating:

> THE COURT: ... You have the option of breaking now, if you wish to, until tomorrow, or you can go further this evening and then break later on. I just wanted to make sure that you know that you have that option, of either breaking now or deliberating further today and breaking again, if you wish to.

While the jury attempted to make a decision regarding its continuation, the trial judge made the following statement to the parties:

> THE COURT: Counsel, I need to give you one other piece of information. When the jury foreperson came down and gave the note that I read to my law clerk, she also said that the vote was 11 to one and while I would not encourage jurors to disclose the vote, the foreperson apparently did that voluntarily and you need to know any communication that came from the jury as well. All right.

When the proceedings resumed, appellant requested to waive his right to a unanimous verdict and to accept the majority verdict of the jury. During a brief recess, the parties and the court researched the legality of such a waiver. The court announced that its research indicated that a defendant could in fact waive his or her right to a unanimous

---

14. *See* Maryland Criminal Pattern Jury Instructions (MPJI–Cr) 2:01 (jury's duty to deliberate).

verdict when the parties and the court agreed to permit the waiver. Though appellant reiterated his request for waiver, the State was unwilling to acquiesce at that time, and the jury was released and set to reconvene the following day.

During the commencement of the proceedings on January 19, 2011, both parties informed the court that they would consent to a waiver of appellant's right to a unanimous verdict. The following colloquy, regarding appellant's waiver, occurred:

[APPELLANT'S COUNSEL]: ... Mr. Clayborne, you and I have discussed this step you wish to take here, right? That's what I'm calling you consenting or agreeing to allow the Judge to accept a majority verdict.

\* \* \*

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Okay. And what—and that's not a unanimous verdict. You understand that?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: And do you know what a unanimous verdict is?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Okay. Just in case and so that the record is clear, a unanimous verdict means that all 12 of the jurors have to decide, either one way or another beyond a reasonable doubt that you're guilty or not guilty, based on the evidence that they received. Do you understand that?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: And that's your absolute Constitutional Right to have a unanimous verdict by a jury of your peers. Do you understand that?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: And I had told you that— well, you've heard that the jury is right now saying that they are deadlocked and can't reach a unanimous verdict. As a matter of fact, we now know that they are 11 to one.

We don't know if it's guilty or not guilty but they are split along the lines of 11 to one; is that correct?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Okay. And I have advised you that I believe we're on the path to a hung jury. In other words, that they can't reach a unanimous verdict and there will come a time if it stays that way and this one person doesn't change their mind, that His Honor will decide that they've deliberated long enough and declare the jury hung, meaning a mistrial will be declared and this case—for today, this jury trial will be over.

Now, the State has the absolute right to try the case again for as many times as they wish to but there may be a hung jury in this case. Do you understand that?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Now, and you understand that I have advised you to wait for a unanimous verdict; correct?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Okay. Now, understanding what your right to a unanimous jury verdict is; do you wish to waive that right?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: And—I don't know how far Your Honor wishes me to go. Are you thinking with a clear head here today, Mr. Clayborne?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Are you under the influence of any drugs or alcohol?

[APPELLANT]: No.

[APPELLANT'S COUNSEL]: Okay. Is there any questions you wish to ask me on or off the record?

[APPELLANT]: No.

[APPELLANT'S COUNSEL]: And as a matter of fact, just to continue to make the record clear, you have—your largest or biggest concern was if you agree, which you are

agreeing to accept this majority verdict, your biggest concern is if it's a guilty verdict, you're worried that you can still appeal this case; correct?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: And I have explained to you that yes, you can. You have an automatic and absolute right of appeal, but that's why His Honor is making the record clear here today that you're waiving your right to that unanimous verdict and it's unlikely you would be able to win a reversal on the fact that the Court accepted a non-unanimous verdict. Do you understand that?

[APPELLANT]: Yes.

[APPELLANT'S COUNSEL]: Okay. Your Honor, if you wish me to make further inquiry, I will or I turn him over to the Court.

THE COURT: All right. Mr. Clayborne, I want to ask you a few questions myself just to make sure that I'm satisfied. Have you been treated for any mental illness or any mental problem in the last five years?

[APPELLANT]: No.

THE COURT: All right. You're not on any medication now?

[APPELLANT]: No.

THE COURT: And you feel that you're thinking clearly today?

[APPELLANT]: Yes.

THE COURT: All right. Now, [appellant's counsel] has already explained to you very well what it is that you're giving up. You understand you will have the right to appeal, but it is very unlikely if I find that you are proceeding voluntarily with waiving the unanimous jury that you would be able to appeal on that ground. Do you understand that?

[APPELLANT]: Yes.

THE COURT: Now, I will be very frank with you. I believe and no one can predict this, but I believe that the

jury is weighted toward convicting you and I believe that by doing this, you are going to get a conviction of at least some counts in this case. Do you understand that?

[APPELLANT]: Yes.

THE COURT: All right. So, you're taking—you realize that you're taking the chance that the 11 to one might be in your favor or it might be against you?

[APPELLANT]: Yes.

THE COURT: And because you have the right to insist on a unanimous verdict as [appellant's counsel] has already told you, if even that one juror were holding out to find you not guilty, that would result in no verdict in this case and a retrial of the case. Do you understand that?

[APPELLANT]: Yes.

THE COURT: Are you proceeding because of—with this waiver because you simply don't want to be held in jail any longer?

[APPELLANT]: No, it's not that. It's—I just have strong beliefs in the jury right now as far as—you know what I mean? And I—

THE COURT: So, you think that the jury is heading towards acquittal?

[APPELLANT]: Yes.

THE COURT: All right. And you wish to take that chance?

[APPELLANT]: Yes.

THE COURT: And you understand you're giving up the possibility that it would be a hung jury and risking the chance that it will be a conviction?

[APPELLANT]: Yes.

THE COURT: And you realize that on a conviction in this case, you face a substantial amount of incarceration?

[APPELLANT]: Yes.

THE COURT: All right. Do you have any other questions for me?

[APPELLANT]: For example, like the hung jury, how long would it actually take if it was a hung jury to get back into trial?

THE COURT: To get back for retrial?

[APPELLANT]: Yeah.

THE COURT: Your case would be sent back to postponement court. The court would have to schedule a new trial date. I can't predict that exactly, but I would guess that it's going to be at least a matter of months, if not closer to a year.

[APPELLANT]: Okay. That's long.

THE COURT: Any other questions?

[APPELLANT]: No.

THE COURT: [Appellant's counsel], anything else?

[APPELLANT'S COUNSEL]: Your Honor, simply that he had made that inquiry of me also about the length of time if there was a retrial and I indicated—I didn't say a year. I said it was out of my hands and it would be up to the Administrative Judge.

A large factor would be my ordering of the transcript and how long it took to compile that and get it into my hands, because that would be a necessary part in the retrial. But, we did discuss that matter and I believe it was answered satisfactorily and no, Your Honor. Other than that, I have no further inquiry.

THE COURT: All right. Mr. Clayborne, this is how you wish to proceed?

[APPELLANT]: Yes.

THE COURT: And this is your free and voluntary act in choosing to waive your right to a unanimous verdict?

[APPELLANT]: Yes.

\* \* \*

THE COURT: All right. I find on the record, based on Mr. Clayborne's responses that he is proceeding freely and voluntarily with the waiver of his right to unanimous verdict in this case. Let's bring the jury down.

Appellant was convicted of first degree murder by majority verdict wherein eleven jurors found him guilty, and one juror found him not guilty. All twelve jurors found appellant guilty of carrying a dangerous weapon with the intent to injure. On March 30, 2011, the court imposed sentences of life imprisonment, suspending all but twenty-five years for first degree murder and three years concurrent for the weapons offense. Thereafter, appellant noted an appeal.

Additional facts will be provided as they bear on the issues.

## II.

## DISCUSSION

### (A) Appellant's Waiver Was Knowing, Intelligent, and Voluntary.

Appellant preliminarily asserts that his waiver of a unanimous verdict was neither competently nor intelligently rendered for two reasons. First, appellant contends that he was misled by his counsel's statement that if the jury were "hung," that "the State ha[d] the absolute right to try the case again for as many times as they wish[ed]." Stated differently, he attests that the impression given by counsel's statement leads to an erroneous conclusion that the State could repeatedly try him until he was convicted. Second, appellant additionally argues that his waiver was not knowing because he was not informed by the court whether the eleven jurors were favoring conviction or acquittal.

Conversely, the State asserts that when the record is "viewed in its totality," appellant's waiver was competently and intelligently made, and that "the vote of eleven jurors to convict him of first-degree murder should be affirmed." We find the State's argument more persuasive.

To be sure, Maryland generally adheres to the common law system of trial by jury of twelve persons who must unanimously agree on a verdict. *State v. Gorman,* 315 Md. 402, 405, 554 A.2d 1203 (1989) (citing Maryland Rules 4–311(b) [15] and 4–

---

15. Rule 4–311, entitled, "Trial by jury," in relevant part, states:

327(a) [16], and *State v. McKay*, 280 Md. 558, 375 A.2d 228 (1977)). *See also Caldwell v. State*, 164 Md.App. 612, 630, 884 A.2d 199 (2005). This practice comports with the Sixth Amendment to the United States Constitution [17] and with Article 21 of the Maryland Declaration of Rights.[18] *Id.* (citing *Swain v. Alabama*, 380 U.S. 202, 211, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and Maryland Rule 4–311(a)). The Court of Appeals has previously explained this State and federally recog-

---

(a) Right preserved. The right of trial by jury as guaranteed by the Maryland Constitution and the Maryland Declaration of Rights as provided by law shall be preserved to the parties in circuit court inviolate.
(b) Number of jurors. A jury shall consist of 12 persons unless the parties stipulate at any time in writing or on the record that the jury shall consist of any number less than 12.

16. Rule 4–327(a) requires that "[t]he verdict of a jury shall be unanimous and shall be returned in open court." Md. Rule 4–327(a).

17. The Sixth Amendment to the United States Constitution provides:
In all criminal prosecutions, the accused shall enjoy the right of a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.
U.S. CONST. amend. VI. *See also* Article III, section 2, clause 3 of the United States Constitution, which provides:
The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trail Shall be held in the State where the said Crimes shall have been committed, but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.
US. CONST art. III, § 2, cl. 3.

18. Article 21 of the Maryland Declaration of Rights provides "[t]hat *in all criminal prosecutions, every man hath a right to* be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defense; to be allowed counsel; to be confronted with the witness against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to *a speedy trial by an impartial jury, without whose unanimous consent he ought not be found guilty."*
Md. Decl. of Rights, art. 21 (emphasis added).

nized constitutional right in *Ford v. State,* 12 Md. 514 (1859), stating:

> 'The verdict is the *unanimous* decision made by the jury and reported to the court, on the matters lawfully submitted to them in the courts of the trial.' *Unanimity* is indispensable to the sufficiency of the verdict.

*Id.* at 549 (quoting 10 Bacon's Abridged Title Verdict, 306) (emphasis in *Ford, supra,* 12 Md. at 549), *quoted in Jones v. State,* 384 Md. 669, 683, 866 A.2d 151 (2005).

██ Nonetheless, the United States Supreme Court has concluded that neither the Sixth Amendment nor the Fourteenth [19] Amendment is offended by a state provision imposing less-than-unanimous verdicts in all but capital cases—notwithstanding a defendant's refusal to consent to a non-unanimous verdict. *See Apodaca v. Oregon,* 406 U.S. 404, 406, 410–12, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (holding that a state law providing that criminal defendants could be convicted by a nonunanimous verdict, as long as ten members of the jury agreed, did not violate the Sixth Amendment applicable to the states via the Fourteenth Amendment to the Constitution); *Johnson v. Louisiana,* 406 U.S. 366, 368–69, 92 S.Ct. 1635, 32 L.Ed.2d 162 (1972) (Powell, J., concurring), *discussed in McKay,* 280 Md. at 565–66, 375 A.2d 228. As a consequence, neither the Sixth Amendment nor the Fourteenth Amendment to the United States Constitution are abridged when the defendant does consent and waives his or her right to a unanimous verdict. *McKay,* 280 Md. at 566, 375 A.2d 228.

---

**19.** The Fourteenth Amendment of the United States Constitution, in relevant part, provides:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. CONST. amend. XIV, § 1.

■ In addition, the Court of Appeals had explicitly concluded that "[t]here is no historical support . . . for an interpretation of Article 21 that would make jury unanimity an imperative requirement as opposed to a right which can be waived." *Id.* at 569, 375 A.2d 228. Like other constitutional rights, it exists for the primary benefit of the criminal defendant. *Id.* at 571, 375 A.2d 228. *Accord Allen v. State,* 77 Md.App. 537, 543, 551 A.2d 156 (1989). Indeed, this principal is well established in Maryland. *Allen,* 77 Md.App. at 543–44, 551 A.2d 156. *See also State v. Santiago,* 412 Md. 28, 38 n. 4, 985 A.2d 556 (2009); *Rice v. State,* 311 Md. 116, 129, 532 A.2d 1357 (1987). Thus, a defendant's right to a unanimous verdict-although a fundamental constitutional right—may be duly waived by the express consent of the defendant, the State, and the court. *See McKay,* 280 Md. at 567, 375 A.2d 228 (relying on *Patton v. United States,* 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930). *Accord Allen v. State,* 77 Md.App. 537, 544, 551 A.2d 156 (1989). *See also Jones,* 384 Md. at 683, 866 A.2d 151).

■ A defendant's waiver to a unanimous verdict, however, is "not without its qualifications." *McKay,* 280 Md. at 572, 375 A.2d 228. Because the right to a unanimous verdict is a "fundamental constitutional right guaranteed the defendant in a criminal case," *Id.* at 572, 375 A.2d 228, "he may forgo this right only if, upon consideration of the particular facts and circumstances in each case, he 'competently and intelligently' decides to waive the right." *Allen,* 77 Md.App. at 544, 551 A.2d 156 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 469, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). *Cf. Bruce v. State,* 328 Md. 594, 603, 616 A.2d 392 (1992) ("different standards exist for assessing the validity of defendants' waivers of rights, depending upon the nature of the right involved. The greatest protection is afforded fundamental constitutional rights under [the standard required by the Supreme Court in] *Johnson v. Zerbst* [.]") (citation omitted). Thus, in the case of a fundamental constitutional right—like the right to a unanimous jury verdict in a criminal proceeding—the inquiry required to assure a valid waiver of the defendant's right

. . . imposes a serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to [a unanimous jury verdict], whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for the determination to appear upon the record.

*Johnson v. Zerbst,* 304 U.S. at 465, 58 S.Ct. 1019. "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused . . . intelligently and understandingly rejected the [right]. Anything less is not a waiver." *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962) (applying the *Johnson v. Zerbst* standard to the waiver of an accused's right to counsel), *quoted in Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) (adopting the inquiry to a determination of whether a guilty plea by an accused is voluntarily made). *See also McKay,* 280 Md. at 573–74, 375 A.2d 228; *Allen,* 77 Md.App. at 544–45, 551 A.2d 156; *Bruce,* 328 Md. at 604, 616 A.2d 392. *Cf. Martinez,* 309 Md. at 133–34, 522 A.2d 950. Because arguments of "[i]gnorance, incomprehension, coercion, terror, inducements, [and] subtle or blatant threats might be a perfect cover-up of unconstitutionality," *Boykin,* 395 U.S. at 242–43, 89 S.Ct. 1709, we turn to the previously established authority of the Court of Appeals and this Court. We find the Court of Appeals opinion in *State v. McKay,* 280 Md. 558, 375 A.2d 228 (1977), and this Court's opinion in *Allen v. State,* 77 Md.App. 537, 551 A.2d 156 (1989), instructive.

In the watershed case of *State v. McKay,* the defendant, McKay, had been charged with armed robbery and seven related offenses. 280 Md. at 559, 375 A.2d 228. At the conclusion of the McKay's trial, the charges to which the trial court did not grant him a judgment of acquittal were submitted to the jury for deliberation. *Id.*[20] After the jury had

---

**20.** At the conclusion of the State's case-in-chief, the court granted McKay judgment of acquittal as to all but the first count charging

deliberated for "approximately one hour," the jury's forelady proceeded to announce that the jury had found appellee not guilty under the first count of armed robbery, but "could not come to a unanimous decision" as to the third count of robbery. *Id.* at 559–60, 375 A.2d 228.

Following the court's admonishment to the jury that it must make a unanimous decision, the jury resumed deliberations. *Id.* at 560, 375 A.2d 228. Those deliberations, however, were ephemeral, as the jury returned to the court ninety minutes later, "still unable to reach a unanimous verdict on the third count." *Id.* As a consequence, McKay's counsel informed the court that he would be willing to accept a majority vote on the third count. *Id.* In response, the trial court reminded McKay that he had a constitutional right to "insist upon a unanimous vote" or, "alternatively," a right to retrial. *Id.* Uncertain of the court's advisement, McKay asked the court to clarify, at which the following colloquy ensued:

DEFENDANT MCKAY: What will that mean, I'll have to be *tried again* [?]

THE COURT: Yes.

DEFENDANT MCKAY: The *whole trial* [?]

[MCKAY'S COUNSEL]: The *whole trial.*

DEFENDANT MCKAY: We'll take what's up.

[MCKAY'S COUNSEL]: You will take what the majority is?

DEFENDANT MCKAY: Yes.

*Id.* at 561 n. 2, 375 A.2d 228 (emphasis in original). After being further cautioned that McKay maintained the "absolute right under the law to have the *whole trial* tried *all* over again," McKay, again, informed the court that he would accept a majority verdict. *Id.* at 561, 375 A.2d 228. The jury returned, "and the forelady announced that the appellee had been found not guilty under counts one and eight, but nine

---

armed robbery, the third count charging robbery, and the eighth count charging use of a handgun in the commission of a crime of violence. *McKay,* 280 Md. at 559, 375 A.2d 228.

jurors had voted 'guilty' as to count three and three had voted 'not guilty.'" *Id.* McKay subsequently appealed his conviction to this Court, which held that unanimity could not be waived and we therefore reversed his conviction. *Id.* at 559, 561, 375 A.2d 228 (citing *McKay v. State*, 32 Md.App. 451, 462–63, 362 A.2d 666 (1976)). As a result, State petitioned the Court of Appeals for a writ of certiorari.

The Court of Appeals granted certiorari to determine whether waiver of a defendant's right to a unanimous verdict was prohibited by the Maryland Declaration of Rights. *Id.* at 559, 375 A.2d 228. Disagreeing with this Court's reasoning, the Court of Appeals held that a defendant may waive unanimity of verdict "provided not only that the court and prosecution consent, but also that the waiver by the defendant conforms strictly with applicable constitutional standards." *Id.* at 572, 375 A.2d 228. Nonetheless, the High Court concluded that McKay's waiver was invalid because of his obvious misunderstanding of his rights on retrial. *Id.* at 573–74, 375 A.2d 228. Specifically, it noted:

> [McKay's] paramount concern was apparent from the colloquy with the court: whether a mistrial for lack of unanimity on the third count would mean a new trial not only on that count, but also on the first and eighth, and possibly even on those which had been the subject of judgment of acquittal. This was evident from his repeated questions concerning the "whole trial." Not only did the court remain silent when defense counsel advised his client that a retrial would mean "the whole trial," but the court itself informed [McKay] that he had "an absolute right under the law to have the whole trial tried all over again" and asked him whether he wished to accept "a majority vote" on count three or "have the case retried?" Only then did appellee reply that he would "take the majority vote."
>
> Given what we regard as a clearcut understanding on the part of [McKay] that a mistrial for lack of unanimity on the third count would have meant, at the very least, a retrial on counts one and eight as well, even though the jury had found him not guilty of those charges, his decision to accept

a majority verdict on the third count was hardly surprising. His consent, however, did not amount to an intelligent and competent waiver, since it rested on a grossly inaccurate premise. That he could not be retried on the charges of which he had been acquitted, without being placed in double jeopardy, was settled in *Pugh v. State*, 271 Md. 701, 706–707, 319 A.2d 542 (1974).

*McKay*, 280 Md. at 572–74, 375 A.2d 228. As a consequence, the Court of Appeals affirmed the judgment of this Court and concluded that "[n]o consent founded on such defective grounds can amount to an intelligent and competent waiver of a constitutional right." *Id.* at 574, 375 A.2d 228.

Twelve years after the Court of Appeals' decision in *McKay*, this Court, in *Allen v. State*, 77 Md.App. 537, 539, 544–46, 551 A.2d 156 (1989), reversed an accused's criminal conviction based on a majority vote of eleven to one and determined that the trial court had erred in the procedures used in connection with an accused's agreement to accept a majority verdict. There, we noted, however, that it was "quite clear" from the record that the defendant, Allen, "understood the implication of a waiver." *Id.* at 544, 551 A.2d 156. Alternatively, we concluded that the trial court's failure to inform Allen of the full contents of a jury communication pursuant to Md. Rule 4–326(d) [21] (then, Md. Rule 4–326(c))—which would have informed Allen that the sole juror precluding unanimity was preventing the jury from reaching a unanimous verdict of guilty [22]—had rendered his waiver unintelligent and unknow-

---

**21.** Rule 4–326, entitled, "Jury—Review of Evidence—Communications," states in relevant part:

(d) Communications with jury. The court shall notify the defendant and the State's Attorney of the receipt of any communication from the jury pertaining to the action as promptly as practicable and in any event before responding to the communication. All such communications between the court and jury shall be on the record in open court or shall be in writing and filed in the action. The clerk or the court shall note on a written communication the date and the time it was received from the jury.

Md. Rule 4–326(d).

**22.** Specifically, the note read as follows:

ing. *Id.* at 545–46, 551 A.2d 156.[23]

---

> To let you know where we stand, we are 11 guilty, 1 not guilty. We could be here [three] months and he says he *will* not change his mind. We will deliberate as long as you wish, but this is what we are up against.

*Allen,* 77 Md.App. at 540, 551 A.2d 156. The trial court discussed the note in a meeting in chambers with both counsel and only informed counsel that the jury was "irreparably hung." *Id.* The judge, however, neither disclosed the exact number of the vote nor in whose favor it stood. *Id.* Further, because the chambers discussion was unrecorded, this Court did not have the benefit of what was, in fact, relayed to the parties. *Id.*

23. In making this conclusion, Judge Rosalyn B. Bell, writing for this Court, imparted a bright-line rule that requires the trial court to read the contents of any jury communication directly to the parties, noting:

> We realize that if the trial judge had disclosed the entire contents of [the note] there would have been no possibility of waiver. We think, however, that any gain in the speedy and efficient administration of justice, i.e., avoiding a retrial, is outweighed by a criminal defendant's interest in being able to assess intelligently his chances before waiving his right to a unanimous verdict. Therefore, we establish a "bright-line" rule which requires a trial judge to read the contents of any jury communication to both the State and the defense before allowing the defendant to accept a majority verdict. A bright-line rule in cases such as this will avoid the uncertainties which would arise were we to hold merely that the *substance* of jury communications be revealed. If this means that no waiver is possible where the jury has revealed its position, so be it.

*Allen,* 77 Md.App. at 546, 551 A.2d 156 (emphasis in original).

Appellant, however, presents no argument on the issue of the bright-line test. His reliance on our decision in *Allen* is solely premised on the assertion that "[w]ithout knowledge of the nature of the jury's numerical split, Mr. Clayborne simply could not have made an intelligent decision about whether to waive his right to a unanimous verdict."

As a consequence, we decline to exercise consideration of an issue rendered an abandoned contention by appellant's failure to present it in his brief and failure to present it with particularity. Md. Rule 8–504(a) (brief shall contain "[a]rgument in support of the party's position"). *See Poole v. State,* 207 Md.App. 614, 633, 53 A.3d 479 (2012) (declining to address argument not presented with particularity when appellant presented the argument in a one-sentence footnote); *Assateague Coastkeeper v. Md. Dep't of the Env't,* 200 Md.App. 665, 667 n. 4, 28 A.3d 178 (2011) ("Appellants failed, however, to present any argument on this issue. Therefore, we will not address it."), *cert. denied,* 424 Md. 291, 35 A.3d 488 (2012); *Honeycutt v. Honeycutt,* 150 Md.App. 604, 618, 822 A.2d 551 (refusing to address argument because appellants failed to adequately brief the argument), *cert. denied,* 376 Md. 544, 831 A.2d 4 (2003).

Following our conclusion that Allen's waiver failed to satisfy constitutional standards and, therefore, required reversal, we "felt compelled" to address another "troubling aspect" of Allen's waiver: "the fact that the trial judge initiated the waiver by suggesting to appellant, via defense counsel, that he might consider going with a majority verdict." *Id.* at 546–47, 551 A.2d 156. Expressing grave concern about the potential for coercion where the trial judge suggests acceptance of a majority verdict, we determined that

> ... we [could] think of no circumstances where it is appropriate for a trial judge to suggest a waiver. It should be remembered that, in the instant case, the trial judge was the *only* person (with the exception of the jury) who knew that the 11 members of the jury had voted to convict [the defendant]. Thus, the trial judge knew *when* he made the suggestion to [the defendant], that if [the defendant] agreed he would be convicted. As the instant case illustrates, such a suggestion can place a reviewing court in the uncomfortable position of wondering whether the trial judge was truly impartial.

*Id.* at 549, 551 A.2d 156 (emphasis in original). Therefore, we concluded that the trial judge's suggestion amounted to a "subtle form of coercion," and that "the safe practice ... is for trial judges to refrain from making such suggestions." *Id.*[24] As a result, we reversed the judgment of the trial court. *Id.* at 551, 551 A.2d 156.

■ The circumstances present in *McKay* or *Allen*, however, are inapposite to the case at bar. In the instant case, appellant, against the advice of counsel, express his wish to waive his right to a unanimous verdict and accept the majority

---

24. We premised our finding of "subtle coercion" on the fact that this particular judge would ultimately sentence Allen and/or preside at any retrial. *Allen*, 77 Md.App. at 549, 551 A.2d 156. We further noted that the trial judge's additional failure to assure Allen that any decision he made about the majority verdict would have no impact at sentencing or further proceedings; and, therefore, when read in conjunction with the court's other conduct, supported our conclusion that Allen's waiver was unintelligent and unknowing. *Id.* at 549, 551 A.2d 156.

verdict. As a consequence, appellant's counsel and the trial court engaged in an extensive waiver inquiry with appellant. The waiver inquiry included questions relating to appellant's capacity to make a voluntary decision and ruled out the possibility of drugs, alcohol, and mental illness or impairment. To ensure appellant's understanding of his selection, his counsel not only advised appellant regarding the meaning of an unanimous verdict, he further informed appellant of his constitutional right to that unanimous verdict:

> [APPELLANT'S COUNSEL]: Okay. Just in case and so that the record is clear, a unanimous verdict means that all 12 of the jurors have to decide, either one way or another beyond a reasonable doubt that you're guilty or not guilty, based on the evidence that they received. Do you understand that?
>
> [APPELLANT]: Yes.
>
> [APPELLANT'S COUNSEL]: And that's your absolute Constitutional Right to have a unanimous verdict by a jury of your peers. Do you understand that?
>
> [APPELLANT]: Yes.

All of the jury's communications to the court were properly disclosed to the parties, including the communication which prompted appellant to request a majority verdict. Even though the jury's communication did not indicate the nature of the eleven to one split, the judge explicitly cautioned appellant of the court's belief that the majority likely favored appellant's conviction:

> THE COURT: Now, I will be very frank with you. I believe and no one can predict this, but I believe that the jury is weighted toward convicting you and I believe that by doing this, you are going to get a conviction of at least some counts in this case. Do you understand that?
>
> [APPELLANT]: Yes.
>
> THE COURT: All right. So, you're taking—you realize that you're taking the chance that the 11 to one might be in your favor or it might be against you?
>
> [APPELLANT]: Yes.

After appellant's counsel further noted on the record his disapproval of his client's selection and advised appellant against the requested waiver, the trial court additionally cautioned appellant of the risk involved in making such a selection:

[APPELLANT'S COUNSEL]: Now, and you understand that I have advised you to wait for a unanimous verdict; correct?

[APPELLANT]: Yes.

\* \* \*

THE COURT: And you understand you're giving up the possibility that it would be a hung jury and risking the chance that it will be a conviction?

[APPELLANT]: Yes.

THE COURT: And you realize that on a conviction in this case, you face a substantial amount of incarceration?

[APPELLANT]: Yes.

Notwithstanding the advisement by both the court and counsel that accepting a majority verdict could lead to a conviction by less than a unanimous jury and that such a conviction would result in a substantial period of incarceration, appellant's concern regarding the possibility of a hung jury was the length of time that would lapse between the court's finding of a mistrial and his retrial.

[APPELLANT]: For example, like the hung jury, how long would it actually take if it was a hung jury to get back to trial?

THE COURT: To get back for retrial?

[APPELLANT]: Yeah.

THE COURT: Your case would be sent back to postponement court. The court would have to schedule a new trial date. I can't predict that exactly, but I would guess that it's going to be at least a matter of months, if not closer to a year.

[APPELLANT]: Okay. That's long.

Appellant never suggested that he was concerned with the length of time he would remain incarcerated if he had been acquitted. In fact, appellant informed the court that he wished to waive his right to a unanimous verdict, and, alternatively opt for a majority verdict, because he believed the jury was headed toward an acquittal:

THE COURT: Are you proceeding because of—with this waiver because you simply don't want to be held in jail any longer?

[APPELLANT]: No, it's not that. It's—I just have strong beliefs in the jury right now as far as—you know what I mean? And I—

THE COURT: So, you think that the jury is heading toward acquittal?

[APPELLANT]: Yes.

THE COURT: All right. And you wish to take that chance?

Thus, his dialogue with the court demonstrated an understanding that an acquittal would not result in a retrial of the same criminal charges. Appellant clearly understood that an acquittal would bar the State from retrying the case, otherwise he would not have had any incentive to accept a majority verdict in the first place.

A review of the record leads to the conclusion that appellant's choice to waive his right to a unanimous verdict was based solely on his opposition to a lengthy delay prior to his retrial in the event of a hung jury and prior to any right to appeal should retrial result in a conviction. Indeed, appellant's only concern if the majority verdict resulted in a conviction was whether he maintained an absolute right to appeal:

[APPELLANT'S COUNSEL]: And as a matter of fact, just to continue to make the record clear, you have—your largest or biggest concern was if you agree, which you are agreeing to accept this majority verdict, your biggest concern is if it's a guilty verdict, you're worried that you can still appeal this case; correct?

[APPELLANT]: Yes.

Out of an abundance of caution, his counsel further advised:

[APPELLANT'S COUNSEL]: And I have explained to you that yes, you can. You have an automatic and absolute right of appeal, but that's why His Honor is making the record clear here today that you're waiving your right to that unanimous verdict and it's unlikely you would be able to win a reversal on the fact that the Court accepted a non-unanimous verdict. Do you understand that?

[APPELLANT]: Yes.

Despite counsel for appellant's advisements, the court's cautionary explanation, and the appellant's clear understanding of the risks involved; the appellant still chose to place his faith in the jury's decision. Therefore, appellant's elimination of a hung jury provided appellant what he desired: avoidance of an unwanted delay to any potential appellate review in the event that he was convicted rather than acquitted. Accordingly, we conclude that appellant competently and intelligently accepted a majority verdict; and, thus, appellant's waiver to a unanimous verdict was valid.

**(B) THE TRIAL COURT PROPERLY EXERCISED ITS DISCRETION WHEN IT PERMITTED TESTIMONY THAT ONE OF THE STATE'S KEY WITNESSES HAD EXPRESSED CONCERNS ABOUT HER SAFETY.**

Appellant next asserts that the trial court erred by admitting evidence that the State's witness, Ms. Gibbs, was concerned for her safety. Specifically, he insists that Ms. Gibbs' testimony was unduly prejudicial because it was unclear whether appellant was, in fact, responsible for her fear and because the trial court "never instructed the jury that evidence of Ms. Gibbs' fear was admissible only for the limited purpose of judging her credibility." In response, the State contends that the trial court properly exercised its discretion on the issue, "and, in any event, [appellant's] complaint that the evidence was admitted without a limited instruction was

waived when his trial counsel objected to a limiting instruction."

Less than a month after Mr. Thompson was killed, Ms. Gibbs informed police that she heard appellant and Mr. Thompson arguing over drugs and that she had witnessed appellant murder Mr. Thompson. At trial, however, she stated that she had not "witness[ed] that exactly," and was under the influence of drugs at the time. As a result, appellant's trial counsel sought to establish that her pretrial statement identifying appellant as the offender—which Ms. Gibbs renounced at trial—was induced by a promise to get her out of jail:

[APPELLANT'S COUNSEL]: ... After you spoke to Detective Pittman and he recorded your statement that you have just said that you made up, the case that you were arrested for that you said was false didn't that case go away and you got out of jail, that's why you're here today on the street?

[MS. GIBBS]: So I can only answer yes or no and not tell my—yes.

[APPELLANT'S COUNSEL]: Is that true?

[MS. GIBBS]: It's true but that's not how it exactly went.

[APPELLANT'S COUNSEL]: Well, you spoke to Detective Pittman?

[MS. GIBBS]: Okay.

[APPELLANT]: Then you went back to jail. Then you spoke to the Assistant State's Attorney and Detective Pittman and now you're on the street.

[MS. GIBBS]: Yes.

During the State's redirect examination of Ms. Gibbs, the prosecutor approached the bench and stated her intent to elicit testimony that, during the meeting between Ms. Gibbs and Detective Pittman, Ms. Gibbs had expressed concerns for her safety:

[THE STATE]: I'm approaching in an abundance of caution in light of the fact that Defense specifically made a point of

asking her about her meeting with myself and Detective Pittman, my intention is to next ask when she met on July 1st, 2009 she expressed any concerns regarding being a witness in this case.

THE COURT: I'm sorry. Concerns what? About what?

[THE STATE]: About being a witness in this case and she did. She actually referred to a specific threat that her daughter received.

I am not going to ask for the specifics of that but my intention is to ask if at the time she expressed any concerns with respect to being a witness in this case and whether or not she asked for a referral to our Victim Witness Assistance Unit. I anticipate that her answers—they should be yes and yes. I have no idea what she is going to say.

THE COURT: Is that interview on record?

[THE STATE]: This interview was not recorded. It was conducted in the presence of Detective Pittman so if she denies it I will be seeking to ask Detective Pittman those generalized questions. I do not want to get into the threat that she relayed to us. I simply want to get in—

THE COURT: Would you proffer that she stated that there was a specific threat by [appellant] to her?

[THE STATE]: Well, it was not a threat by [appellant]. It was a threat by an unknown individual. Her daughter went to collect some of her property from the location.

She had left that area out of concern for being a witness in this case and comments were made to her daughter indicating that physical harm may come to the family if her mother were to testify.

THE COURT: But not allegedly by [appellant]?

[THE STATE]: Not allegedly by [appellant] but I believe under *Washington* [ *v. State,* 293 Md. 465, 445 A.2d 684 (1982) ], that a specific instruction can be generated to advise the jury that this threat was not made by the Defendant but the concern for her safety is essentially being offered as a motivator for why she is now recanting.

I don't have a copy of the case with me but I can bring it in the morning.

And furthermore, that's also why I'm not attempting to get into the specifics of the threat simply that she expressed concerns for being a witness in this case. I don't want to bring up any specific elements of a threat and that she asked for a referral to the Victim Witness Assistance Unit. THE COURT: [Appellant's counsel], what's your view on that?

Appellant's counsel then objected on grounds that he had not "opened the door to this subject ... simply because [he] mentioned a conversation." The trial court then ruled:

I don't think the door is opened based on simply asking the conversation. I think the door is opened because the Defense has raised the theory that she lied in her prior statements merely to get out of jail and her testimony at this point that she was out of jail.

And the State can now raise the possible other motive why the witness would now change her story again at the time of trial.

So, I am going to allow the State to go into it and I will give the cautionary instruction depending on what it is the witness says that her concerns about the threat are not to be attributed to the Defendant.

It's simply admitted in order to shed light on the witness's motivation for statement that she made.

Following the additional objection of appellant's counsel to the admission of such testimony on the grounds that it would be more prejudicial than probative, the trial court concluded:

All right. Well, I believe it's appropriate for this—given the fact that this witness is making up a story or not or recanting it today or not is at issue in this trial.

It is probative on that issue and I think the prejudice to [appellant] can be controlled by a cautionary instruction.

The trial court then permitted the State to lead Ms. Gibbs through the following two questions:

[THE STATE]: Ms. Gibbs, isn't it true that in the meeting on July 1, 2009 you expressed concerns for your safety if you were a witness in this case? I need you to answer yes or no?

[MS. GIBBS]: Yes.

[THE STATE]: And isn't it true, Ms. Gibbs, that during that meeting on July 2, 2009, based on those same concerns you specifically requested a referral to the Victim Witness Assistance Unit?

[MS. GIBBS]: Yes.

The trial court additionally permitted the State to question Detective Pittman on the subject as well:

[THE STATE]: Did Ms. Gibbs express concerns about being a witness?

[APPELLANT'S COUNSEL]: Objection.

THE COURT: Overruled.

[THE STATE]: I want you to just [say] yes or no, not specifics[.]

[DETECTIVE PITTMAN]: Yes.

[THE STATE]: Did Ms. Gibbs request a referral to the Victims Witness Assistance Unit?

[DETECTIVE PITTMAN]: Yes.

On appeal, appellant now asks this Court to reverse his conviction, arguing the premise that the admission of this testimony was unduly prejudicial because it was unclear that appellant was not responsible for Ms. Gibbs' fear and because the trial court issued no limiting instruction to the jury. We disagree with appellant's contentions and are more persuaded by the State's argument presented *supra.*

It is a bedrock principle in Maryland that the admission of evidence is committed to the sound discretion of the trial court. *Armstead v. State,* 195 Md.App. 599, 643, 7 A.3d 169 (2010) (citation omitted), *cert. denied,* 418 Md. 191, 13 A.3d 798 (2011). *See Sifrit v. State,* 383 Md. 116, 857 A.2d 88 (2004); *Merzbacher v. State,* 346 Md. 391, 404, 697 A.2d 432 (1997) (internal citations omitted). *See also* Md. Rule 5–104(a)

(stating the "[p]reliminary question concerning . . . the admissibility of evidence shall be determined by the court"). Relevant testimony is generally admissible and irrelevant testimony is not admissible. *Merzbacher,* 346 Md. at 404, 697 A.2d 432 (citing Md. Rule 5–402).[25] "Evidence is relevant if it has a tendency to establish or refute a fact that is at issue in the case." (*Sifrit,* 383 Md. at 128, 857 A.2d 88). *See* Md. Rule 5–401.[26] Therefore, when the trial court determines that testimony offered into evidence is relevant to the case before it, "[w]e are generally loath to reverse a trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of an abuse of discretion." *Merzbacher,* 346 Md. at 404–405, 697 A.2d 432 (citing *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991), *quoted in Sifrit,* 383 Md. at 128–29, 857 A.2d 88. *See also Armstead,* 195 Md.App. at 643, 7 A.3d 169 (citing *Conyers v. State,* 354 Md. 132, 175, 729 A.2d 910 (1999), and *Hopkins v. State,* 352 Md. 146, 158, 721 A.2d 231 (1998))).

 Met with similar procedural circumstances relating to the rehabilitation of a State's witness, the Court of Appeals clearly noted in *Washington v. State* that "[e]vidence of threats to a witness, or attempts to induce a witness not to testify or to testify falsely is generally admissible as substantive evidence of guilt when the threats or attempts can be linked to the defendant and not admissible as substantive evidence absent such linkage." 293 Md. 465, 468 n. 1, 445 A.2d 684 (1982) (citing *Saunders v. State,* 28 Md.App. 455, 459,

---

**25.** Rule 5–402, entitled, "Relevant evidence generally admissible; irrelevant evidence inadmissible," provides:

Except as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible.

Md. Rule 5–402.

**26.** Rule 5–401, entitled, "Definition of 'relevant evidence,' " states:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence.

Md. Rule 5–401.

346 A.2d 448 (1975) (additional citations omitted), *quoted in Armstead,* 195 Md.App. at 643, 7 A.3d 169). The Court further acknowledged that "[w]hen a witness is impeached by a prior inconsistent statement, evidence explaining the inconsistency is clearly admissible for the purpose of rehabilitating the witness's credibility." *Washington,* 293 Md. at 469, 445 A.2d 684. *See* Md. Rule 5–616(c)(1) ("A witness whose credibility has been attacked may be rehabilitated by . . . [p]ermitting the witness to deny or explain impeaching facts"). The Court continued by delineating previously recognized examples of an impeached witness's testimony used for the purpose of rehabilitation:

> . . . [A] witness has been allowed to explain prior inconsistent statements by showing that they were induced by bribes, *State v. Minton,* 234 N.C. 716, 68 S.E.2d 844 (1952); that they were made while under sedation, *Hodges v. Haverty,* 115 Ga.App. 199, 154 S.E.2d 276 (1967); that they were made during a period of memory loss, *State Auto. Mut. Ins. Co. v. Ropp,* 7 Mich.App. 698, 153 N.W.2d 172 (1967); that they were made in an attempt to remain uninvolved in the proceeding, *Tucker v. State,* 5 Md.App. 32, 245 A.2d 109 (1968); or that they were induced by threats from the defendant, *State v. Charles,* 525 S.W.2d 360 (Mo.App.1975); *Commonwealth v. Crow,* 303 Pa. 91, 154 A. 283 (1931).

*Washington,* 293 Md. at 469–70, 445 A.2d 684. Following the example of these previously recognized set of circumstances, the Court reasoned that

> [p]ursuant to the rule permitting explanations of prior inconsistent statements, it is generally held that evidence of threats to a witness or fear on the part of a witness, in order to explain an inconsistency, is admissible in criminal cases for credibility rehabilitation purposes *even if the threat or fear have* [sic] *not been linked to the defendant.*

*Id.* at 470, 445 A.2d 684 (citations omitted) (emphasis added). *Accord Brown v. State,* 80 Md.App. 187, 194–95, 560 A.2d 605 (1989) (holding that although evidence of threats to a witness may be offered for the limited purpose of explaining the

witness' prior inconsistent statements in an effort to rehabilitate the witness).

Nonetheless, the defendant, Washington, insisted that the Court should reject the adoption of any rule permitting a witness's rehabilitation through the admission of threats or fear on the part of a witness unless the threats are linked to the accused. *Washington*, 293 Md. at 470, 445 A.2d 684. Rejecting Washington's plea, the Court preliminarily admitted that, "[t]he degree of prejudice caused by the evidence of threats is certainly less when the threats are not connected with the accused than when they are linked to him." *Id.* Notwithstanding the higher degree of prejudice to the accused when the threat has no obvious nexus to him, the court concluded that "any unfair prejudice to the accused in this situation [when the threat has not been linked to the defendant] *can be cured by his requesting a cautionary jury instruction* [.]" *Id.* at 470–71, 445 A.2d 684 (emphasis added). In addition, the Court further emphasized that

> [e]vidence of fear caused by [even] anonymous threats obviously has very high probative value in explaining a prior inconsistent statement. Permitting one side to impeach a witness by showing a prior inconsistency, and not permitting the other side to explain the inconsistency by such probative evidence, does not comport with even-handed administration of justice.

*Id.* at 471, 445 A.2d 684 (referencing *State v. Farmer*, 97 Ariz. 348, 353–54, 400 P.2d 580 (1965)).

More recently, this Court was presented with an issue of witness rehabilitation through the explanation of a threat prior to trial in *Armstead v. State*, 195 Md.App. 599, 640, 7 A.3d 169 (2010). There, at the conclusion of Armstead's cross-examination of the State's witness, Leroy Simon ("Simon"), Simon stated, "I got something I need to say." *Id.* at 641, 7 A.3d 169. Upon the State's redirect examination of Simon, the prosecutor asked Simon what he wanted to say; and Simon replied, "I'm saying, Your Honor, I am doing the best I can.

I—I—was frightened, my life was threatened the day [sic] so I'm doing the best I can." *Id.*

Following Simon's exclamation, the trial court directed the parties to approach the bench. *Id.* Armstead's counsel moved for a mistrial, which the court denied and indicated that it would provide a curative instruction to the jury. *Id.* Defense counsel maintained that she wanted a mistrial, but also requested the that the curative instruction be given. *Id.* As a consequence, the trial court instructed the jury, stating, "Ladies and gentlemen, strike—I'm going to strike the last question and answer. Please disregard the last question and answer. They have nothing to do with this case." *Id.*

Thereafter, the State returned the issue initially addressed during Simon's cross-examination by Armstead's counsel: why Simon did not go to the police. *Id.* Simon replied, "I was scared." *Id.* The response elicited prompted another bench conference, during which Armstead's counsel objected to Simon's statement. *Id.* In response, the State asserted that Simon's response was relevant because the issue had been raised during the defense's cross-examination of the witness. *Id.* The court agreed with the State, distinguished Simon's reply from any specific statement that he had been threatened, and overruled Armstead's objection. *Id.*

Following a recess, the State proffered that Simon had been approached by women outside the courtroom two or three days ago and was threatened. *Armstead,* 195 Md.App. at 642, 7 A.3d 169.[27] As a result, the State, relying on the Court of Appeals opinion in *Washington, supra,* 293 Md. 465, 445 A.2d 684 (1982), asked the court to reconsider its prior ruling striking Simon's testimony that he had been threatened because it explained the inconsistencies between Simon's testimony at trial and his statements prior to trial. *Id.* Over defense counsel's objection, the trial court ruled that testimo-

---

27. The threat occurred shortly after Simon's appearance at a suppression hearing to determine the admission of a photo array in which Simon identified the defendant. *Armstead,* 195 Md.App. at 642, 7 A.3d 169.

ny regarding the threat made toward Simon was admissible and could be considered by the jury, provided that the jury received a limiting instruction. *Id.* At the close of trial, Armstead was convicted of second degree murder and conspiracy to commit murder, and he was sentenced to thirty years. *Id.* at 604, 7 A.3d 169.

On appeal before this Court, Armstead argued that the trial court had erred in admitting Simon's statements that he had been threatened. *Id.* at 640, 7 A.3d 169. Rejecting his contentions and affirming the judgment of the trial court, we noted that "at numerous times during Simon's cross[-]examination, his memory needed to be refreshed[.]" *Id.* at 644, 7 A.3d 169. We also recognized Simon's numerous inconsistencies about the time and day he witnessed the criminal transactions, noting that Simon "testif[ied] at trial that it happened during daylight hours, but [had told] police that it was '[d]efinitely night time.'" *Id.* As a consequence, we concluded that, on the record before us,

> the trial court [had] not abus[ed] its discretion in admitting evidence that Simon felt frightened and scared. The pertinent comment before the jury came at the end of cross-examination and arguably was Simon's attempt to explain any inconsistencies elicited by defense counsel ['s cross-examination]. As this was admissible solely for the purpose of assessing Simon's credibility, the evidence was properly admitted at trial.

*Id.* at 644–45, 7 A.3d 169 (relying on *Brown*, 80 Md.App. at 194, 560 A.2d 605). Thus, we accordingly affirmed the judgment of the trial court. *Id.* at 647, 7 A.3d 169.

In the instant case, the pertinent in-court testimony of Ms. Gibbs only established that she had seen a man "fussing" with Ms. Leak in front of her home. Ms. Gibbs further asserted that she had seen and heard Ms. Leak telling Ms. Gregg that the man was appellant. This testimony was a stark contrast to the testimony Ms. Gibbs had previously provided to police. *See* Part I, *supra.* During her earlier, recorded statement with police, Ms. Gibbs explained that she had seen appellant

and Mr. Thompson, the victim, engaged in an argument over drugs and that she had witnessed appellant stabbing Mr. Thompson in the back. As a consequence, appellant's counsel used Ms. Gibbs' testimonial inconsistencies to call into question her credibility. Therefore, evidence explaining Ms. Gibbs' inconsistencies was clearly admissible for the purpose of rehabilitating her credibility. *Washington,* 293 Md. at 469, 445 A.2d 684. *Accord Brown,* 80 Md.App. at 194–95, 560 A.2d 605; *Armstead,* 195 Md.App. at 644–45, 7 A.3d 169.

Even so, appellant insists that the facts and reasoning of *Washington* and its progeny are inapposite to the case at bar because no cautionary instruction was ever provided to the jury. Appellant is correct that in *Washington* and its progeny the trial court gave a cautionary instruction that emphasized the limited consideration of the rehabilitative testimony and that it had failed to give similar instruction in this case. Appellant, however, fails to specifically note the reason why the trial court did not give the jury a limiting or cautionary instruction similar to the instructions present in *Washington* and *Armstead.* Appellant's counsel expressly objected to such an instruction. During the conference on proposed jury instructions, the following colloquy ensued:

THE COURT: All right. Now, let's—the Defense has requested 3.13, the witness promises to benefit. I assume because of his gifts.

[THE STATE]: Correct.

THE COURT: And not perhaps related to this because it relates to Ms. Gibbs' testimony, you're asking for—the State is asking for a Washington based instruction on her alleged fear?

[THE STATE]: Well, Your Honor indicated you wanted to give the instruction based on Washington and I think i[n] light of the fact that there were no specific influence of a threat that were elicited, simply that she expressed a concern being a witness in general. I don't believe that a Washington type instruction is necessary.

However, if the Court disagrees, what I did was a[sic] went with a line which is from Washington and attempted to modify it to the facts and circumstances of this case. I do have a response to the promise of leniency.

THE COURT: All right. First on the Washington issue, [appellant's counsel] what's your view on that?

[APPELLANT'S COUNSEL]: I object to that instruction.

THE COURT: All right. I don't think it's necessary. Thank you for including it, ... but I understand that you're only including it because you thought I might want it; is that correct?

[THE STATE]: Well, you said you did.

THE COURT: All right. I won't give it.

We are unpersuaded that the admission of general testimony by Ms. Gibbs that she was fearful as a result of her participation as a witness in this case was unduly prejudicial. Even if the testimony could be construed as unfairly prejudicial, the Court of Appeals opinion in *Washington* places the burden upon the defendant to request the appropriate limiting instruction: "[A]ny unfair prejudice to the accused in this situation [when the threat has not been linked to the defendant] *can be cured by his requesting a cautionary jury instruction,* such as given in the present case, telling the jury to consider the evidence only for the purpose of assessing the witness's credibility and not as evidence of guilt." 293 Md. at 470–71, 445 A.2d 684 (emphasis added). As noted, *supra,* it was the *State* that submitted a limiting instruction to the trial court. Moreover, it was *appellant* who objected to the Washington instruction. Appellant failed to suggest any alternative. Accordingly, we conclude that the trial court properly exercised its discretion by admitting the evidence without a limiting instruction.[28]

---

28. We additionally agree with the State that "any error in admitting the evidence without a limiting instruction was invited by [appellant]" and was, therefore, waived. *See generally State v. Rich,* 415 Md. 567, 575, 3 A.3d 1210 (2010). A defendant may not "be permitted to 'sandbag' trial judges by expressly, or even tacitly, agreeing to a proposed

**(C) Appellant's Third Assignment of Error That The "Evidence Was Insufficient To Sustain [Appellant's] Conviction For Openly Carrying a Dangerous Weapon," Is Unpreserved.**

 Appellant's final assignment of error is that the evidence was insufficient to support his conviction for carrying a dangerous weapon openly with the intent to injury. Specifically, appellant attests that "[u]nder the law of the case doctrine, the evidence was insufficient to support [appellant's] conviction for openly carrying a dangerous weapon because the State failed to prove that the knife used to kill Mr. Thompson was a dangerous weapon as defined by the jury instruction." (Footnote omitted). Appellant, however, presents this argument notwithstanding his concession that he failed to raise this argument below.

In fact, appellant failed to move for a judgment of acquittal at the close of the State's case or at the close of all evidence on the ground that the State failed to prove the knife used to kill Thompson was one of the weapons outlined in the trial court's jury instruction. Moreover, appellant failed to raise any objection to the court's jury instructions, and he did not argue the "law of the case" doctrine at any point during trial. In addition, we are unpersuaded that appellant's sufficiency challenge occupies a "unique procedural posture."

Accordingly, we conclude that appellant's legal assertions are unpreserved for our review. See Md. Rule 4–324(a) (requiring a defendant to move for judgment of acquittal at the close of the State's case or at the close of all the evidence and "state with particularity all reasons why the motion should be granted"); [29] Md. Rule 8–131(a) ("Ordinarily, the appellate

---

procedure and then seeking reversal when the judge employs that procedure; ... nor will they freely be allowed to assert one position at trial and another, inconsistent position on appeal." *Miles v. State,* 365 Md. 488, 554, 781 A.2d 787 (2001) (quoting *Burch v. State,* 346 Md. 253, 289, 696 A.2d 443, *cert. denied,* 522 U.S. 1001, 118 S.Ct. 571, 139 L.Ed.2d 410 (1997)).

**29.** The rule specifically provides that "A defendant may move for judgment of acquittal on one or more counts, or on one or more

court will not decide any other issue unless it plainly appears in the record to have been raised in or decided by the trial court. . . .").

It is a well established principle that our review of claims regarding the sufficiency of evidence is limited to the reasons which are stated with particularity in an appellant's motion for judgment of acquittal. *Taylor v. State,* 175 Md. App. 153, 159, 926 A.2d 805 (2007) (citation omitted). Thus, "[a] defendant may not argue in the trial court that the evidence was insufficient for one reason, then urge a different reason for the insufficiency on appeal[.]" *Bates v. State,* 127 Md.App. 678, 691, 736 A.2d 407 (1999), *quoted in McIntyre v. State,* 168 Md.App. 504, 527–28, 897 A.2d 296 (2006). *See also Starr v. State,* 405 Md. 293, 302, 951 A.2d 87 (2008) ("A criminal defendant who moves for judgment of acquittal is . . . not entitled to appellate review of reasons stated for the first time on appeal.") (citation omitted). To be sure, "no Maryland case has utilized the plain error doctrine to reverse a trial judge's denial of a motion for judgment of acquittal when the ground raised on appeal was never advanced before the trial court at the time the motion for judgment of acquittal was being considered." *McIntyre,* 168 Md.App. at 528, 897 A.2d 296. We, therefore, decline to entertain appellant's sufficiency challenge and accordingly affirm the judgment of the Circuit Court for Baltimore City.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at he close of all the evidence. The defendant shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case." Md. Rule 4–324(a).